This is a medical malpractice case. The issue before us on appeal is whether the trial court erred in directing verdicts in favor of the defendants. We reverse.
The underlying facts in this case are virtually undisputed. On February 6, 1984, Richard W. Stuhr, M.D., performed a bilateral subtotal thyroidectomy on the plaintiff, Judy Timmerman.[1] The surgery involved making a half-moon incision in the front of Ms. Timmerman's neck just above the collar line. As part of the closing *Page 909 
procedure, Dr. Stuhr embedded and exited two small plastic drain tubes to evacuate the blood and serous material that normally accumulate in a surgical site. The drain tubes exited each pole of the incision and connected to a larger tube with a suction vacuum. The drain tubes, which were smaller than a pencil, formed a Y-shaped configuration.
On February 8, 1984, Floyd O. Fitts, M.D., while making rounds at the hospital, first examined Ms. Timmerman. On this occasion, Dr. Fitts determined that Ms. Timmerman's healing had progressed far enough that it was appropriate to remove the drain tubes. As Dr. Fitts attempted to remove the drain tubes, he encountered some initial resistance, which could have been caused by a stitch or some tissue being caught in the tubing. However, Dr. Fitts continued pulling on the tubing and succeeded in removing only a portion of the drain tube from inside Ms. Timmerman's neck.
At that time Dr. Fitts observed that one side of the removed tubing was shorter than the other. Ms. Timmerman was not informed that there might be a problem with regard to the tubing, and no X-rays or diagnostic studies were utilized to determine whether a portion of the tubing remained inside the wound.
On February 9, 1984, Dr. Stuhr examined Ms. Timmerman, determined that she was doing well, and discharged her from the hospital. Three or four days later, she began having difficulty swallowing, and when she tried to swallow water or liquid it came out of her nose and she would get strangled. When she turned her head she experienced pain in the neck area where the surgery occurred. Ms. Timmerman testified that it felt as if something were sticking in her neck and as if something were pulling. Additionally, she testified that she could feel a ridge across her throat.
Ms. Timmerman told Dr. Stuhr of the trouble she was having and asked him about the ridge across her throat. This occurred on February 14, 1986, during her first post-hospitalization office visit. Dr. Stuhr told her that the ridge represented scar tissue and that it would go away if she would massage it.
Ms. Timmerman's next office visit with Dr. Stuhr was on February 27, 1984. On this occasion she asked about the ridge again, and even asked if a tube had been left in her throat for any reason. Dr. Stuhr assured her that there was no tube in her throat and that the ridge represented scar tissue that would never go away if it were not massaged.
Pursuant to this advice, Ms. Timmerman massaged the area and the next morning the upper portion of her face was swollen. Her hands and feet became swollen and she returned to Dr. Stuhr's office on March 5, 1984. At this time Dr. Stuhr considered the pattern of swelling to be common for a person who is retaining fluids and referred Ms. Timmerman to her regular physician, Hayse Boyd, M.D.
Dr. Boyd examined Ms. Timmerman on March 22, 1984, and noted a firm, curvilinear-shaped area above her thyroid surgery scar. He had X-rays taken of her neck and they revealed that a portion of the drain tube remained inside Ms. Timmerman's neck. Dr. Boyd informed her that the tube would have to be removed, and he referred her back to Dr. Fitts.
Ms. Timmerman returned to Dr. Fitts's office on March 27, 1984, at which time Dr. Fitts attempted to remove the drainage tube, using an office procedure. However, she experienced excruciating pain, and was transferred to the hospital with a portion of the tube hanging out of her neck. At the hospital, Dr. Fitts performed an operative procedure, which required anesthesia, to remove the remainder of the drain tube. The tube was approximately 6 1/2 to 7 inches long, and this time X-rays were taken to make sure no tubing remained in her neck.
On February 4, 1986, Ms. Timmerman filed suit against Dr. Fitts and Dr. Stuhr, individually and as agents of Surgical Associates of Tuscaloosa, P.A. A directed verdict was entered in favor of Dr. Stuhr at the close of the plaintiff's case, and at the end of all the testimony, a directed verdict *Page 910 
was entered in favor of Dr. Fitts and Surgical Associates.
The issue before us on appeal is whether the trial court properly entered directed verdicts in favor of the defendants on the ground that there was no expert testimony offered by the plaintiff, other than that of the defendant doctors themselves, regarding the appropriate standard of care and the alleged breach of the duty to use due care.
A directed verdict is proper only where there is a complete absence of proof on an issue material to the claim or where there are no disputed questions of fact on which reasonable people could differ. Worley v. City of Huntsville,452 So.2d 867 (Ala.Civ.App. 1984). On a motion for a directed verdict in a jury trial, the judge may grant the motion only if, without weighing the credibility of the evidence, there is but one reasonable conclusion from the evidence and the law, and that conclusion is that the non-moving party has not presented a prima facie case. Feaster v. American LibertyIns. Co., 410 So.2d 399 (Ala. 1982). When a directed verdict is requested, the entire evidence must be viewed in a light most favorable to the opposing party, and it should be refused where reasonable inferences may be drawn from the evidence unfavorable to the party requesting it or where there is a conflict in any material matter at issue.Baker v. Chastain, 389 So.2d 932 (Ala. 1980). A clear statement of the test is found in Herston v.Whitesell, 374 So.2d 267 (Ala. 1979):
 "[U]nder our system, the jury must be allowed to pass on the evidence if any, no matter how slight, is offered which, if believed, would support a verdict in favor of the party against whom a directed verdict is sought."
Therefore, we will review the evidence in a light most favorable to Ms. Timmerman and determine whether a reasonable inference in support of her claims may be drawn from the evidence.
The plaintiff's theory of recovery against Dr. Stuhr was, in essence, that he negligently failed to diagnose the presence of the tubing in her neck, and hence failed to promptly remove the tube.
Pursuant to Rule 43(b), Ala.R.Civ.P., Dr. Stuhr was called as an adverse witness by the plaintiff. Dr. Stuhr was questioned about the applicable standard of care relative to acceptable and proper post-operative follow-up of a patient having undergone a thyroidectomy. In this regard he testified as follows:
 "Q. Now, when a — when surgery is performed — a thyroidectomy like was performed on Judy, postoperatively the doctor — the reason y'all have them come back to your office is to determine whether or not they are having any post-operative problems, correct?
"A. Correct.
 "Q. And the standard of care, of course, requires you surgeons as well as all doctors — if you've done something to the patient to follow-up on them and make sure they get out of the woods, so to speak and that everything works out okay after the procedure?
"A. That's right.
 "Q. All right. And when a patient comes into a surgeon's office after surgery, the standard of care — and by that, I mean what a reasonably prudent doctor would do under the circumstances, would require you and Dr. Fitts and any other doctor to listen to the patient's complaints, correct?
"A. Correct.
 "Q. And if she makes any complaints of having signs and symptoms such as pain, discomfort, or trouble swallowing, a strangling sensation, or it hurts on movement, then the standard of care would require you doctors to listen to that patient's complaints and to try to assess them — take them into consideration and find out what's causing those symptoms, wouldn't it?
"A. Correct.
 "Q. And there are about two main ways to do that, aren't there? One of them is the physical examination?
"A. Yes, sir. *Page 911 
 "Q. And the other one would be diagnostic studies?
"A. Yes, sir, and the history from the patient.
 "Q. And the history — okay, that's right, the history. The history from the patient is what they tell you, what their complaints are. You take those into consideration and then you determine what kind of physical examination to do, correct?
"A. Yes, sir, uh-huh.
 "Q. So if a patient came in like Judy did after having this kind of surgery and let's assume that she made complaints to you about pain, discomfort, choking, strangling sensation and so forth, the standard of care is going to require you to feel around in her neck area, isn't it?
"A. That's correct.
 "Q. And depending on what you find it may require you to do an X-ray?
 "A. To confirm any suspicious physical findings, yes, sir."
This testimony clearly establishes the appropriate standard of care regarding post-operative procedures and examinations. During the follow-up visits, Dr. Stuhr was under a duty to determine any post-operative problems, listen to the patient's complaints, and investigate these complaints by either physical examination or diagnostic studies. In addition, Dr. Stuhr was under a duty to feel the area and take X-rays of any suspicious physical findings. Dr. Stuhr testified that upon listening to Ms. Timmerman's complaints, he palpated the area of the incision and was of the opinion that the ridge in Ms. Timmerman's neck was a surgical flap line, and that the ridge would go away if it were massaged.
However, when Dr. Boyd examined her throat on March 22, 1984, he felt a foreign object in her throat and ordered a standard X-ray, which showed the drain tube in her throat. The hospital records, as recorded by Dr. Fitts, indicate that there was a palpable defect in the neck area, which was a palpable drain. Furthermore, Dr. Stuhr admitted that the tube was located right under the surface of the skin, just above the thyroid scar, and that it stayed in the same location from the time it was inserted in Ms. Timmerman's neck until the time it was removed.
As stated in Gilbert v. Campbell, 440 So.2d 1048
(Ala. 1983), the general rule in Alabama is that expert medical testimony is required to establish what is and what is not proper medical treatment and procedure. An exception to this general rule exists where an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience. Powell v. Mullins,479 So.2d 1119 (Ala. 1985).
Only in extreme cases will the jury be permitted to find professional misconduct, resulting in injury within the doctor-patient relationship, absent expert testimony as to the standard of care that the doctor is alleged to have breached. Tant v. Women's Clinic, 382 So.2d 1120
(Ala. 1980). In the present case, the facts indicate that only common knowledge or experience is required to understand the doctor's alleged lack of due care or skill. Dr. Stuhr admitted the tube was located above the scar just under the skin and that the tube remained in the same place from the time it was inserted until the time it was removed. Dr. Boyd was able to palpate the tube, and recognized that an X-ray should be taken to confirm his finding of a foreign object in Ms. Timmerman's neck. Additionally, Ms. Timmerman suspected that the tube was in her neck and she specifically asked Dr. Stuhr if this was a possibility. This testimony was sufficient evidence to allow the jury to determine that Dr. Stuhr's diagnosis that the ridge was scar tissue, rather than the drain tube, was a negligent diagnosis or a breach of his duty as a physician.
We find that the plaintiff's failure to provide expert testimony regarding Dr. Stuhr's diagnosis of the ridge as scar tissue, rather than as the drain tube, was not a fatal defect preventing the plaintiff from establishing a prima facie case, and the trial court erroneously entered a directed verdict in favor of Dr. Stuhr.
The plaintiff's theory of recovery against Dr. Fitts was that he breached the standard *Page 912 
of care by failing to remove the entire drain tube from Ms. Timmerman's neck. Dr. Fitts would have us affirm the directed verdict in his favor on the authority of Gilbert,supra, which was a medical malpractice case involving a drain tube left inside a patient. In Gilbert, a directed verdict was entered in favor of the defendant doctor on the ground that there was no evidence that the doctor's conduct fell below the standard of care. Although the present case and Gilbert each involved a drain tube left inside a patient, there are several facts that distinguish the two cases. First, in Gilbert, the doctor had no knowledge of the presence of the drain, it failed to show up on X-rays, and it was not capable of being seen upon external examination. In the present case, Dr. Fitts had actual knowledge of the drain, it was readily visible on an X-ray, and it was capable of being felt upon external examination.
Expert medical testimony is required to describe the proper use, purpose, insertion, and removal of a drain.Gilbert, supra. While Dr. Stuhr was on the stand, he testified as follows regarding the proper use, purpose, insertion, and removal of a drain:
 "Q. Right. Now, as I understand it, let's talk about the proper use, purpose, insertion, and removal of this tube device. As I understand it, it has a very simple use and a very simple purpose and that is only to drain blood and fluid and serous material that accumulates up in that operative area, is that correct?
"A. That's correct.
". . . .
 "Q. And it's standard operating procedure and practice to insert that drain tube into that operative area to — for the simple purpose of draining the blood and serous material and other fluid that accumulates in that area. And that's done in every thyroidectomy surgery, is it not?
"A. Every one I do.
"Q. All right. Of the type [Ms. Timmerman] had?
"A. Yes.
 "Q. Now, once that drain tube has served its purpose and that is, once the blood and the serous material, the fluid, stops accumulating and stops draining, then the purpose and use of that drain ceases, doesn't it?
"A. Correct.
 "Q. In other words, you put it in there for a limited purpose and for a limited time and that is to drain the fluid and blood and other material that collects up in that area, and when the drainage stops you take the tube out, don't you?
"A. Yes.
 "Q. And it is standard operating practice and procedure to remove the tube when that drainage stops, isn't it?
"A. Yes.
 "Q. That's something that you do in every thyroidectomy surgery you perform, isn't it?
"A. Yes.
 "Q. Because once the drainage stops, there is no medical need nor any medical use for that tube, correct?
"A. That's correct.
". . . .
 "Q. You told me — Following up on what you just said, you told me a while ago that it's the standard custom, habit and practice in the national medical community for surgeons like yourself and Dr. Fitts to remove all of the drainage tube once it's served its useful purpose, once the drainage stops, correct?
"A. Yes.
 "Q. And the standard of care would require you to do that, would it not?
"A. Yeah.
". . . .
 "Q. So there's no doubt whatsoever that the proper course of treatment is to remove the drain one hundred percent of the time.
"A. Yes."
Likewise, Dr. Fitts admitted that the standard of care required the removal of the entire drain tube. This testimony clearly establishes the appropriate standard of care as to the proper use, purpose, insertion, and removal of a drainage tube. In every case such as this, the standard of *Page 913 
care is to remove one hundred percent of the drain tube.
Additionally, Dr. Stuhr testified as to the appropriate standard of care when difficulty is encountered in removing the drain tube. In this regard Dr. Stuhr testified as follows:
 "Q. If you — Let me ask you this: If a surgeon is removing a drain and he has some difficulty in removing the drain Let's say that, you know, you just simply pull it out, do you not?
"A. That's right.
 "Q. And you look at it after you pull it out, don't you?
"A. Yeah.
 "Q. And if a surgeon thought that there may be part of the drain left in there — let's say that the tube looked fishy, that it was jagged or it wasn't perfect — the edge he pulled out had a jagged edge on it or had tissue or something, and he thinks there may be a possibility that part of that drain was left in there, then wouldn't the standard of care require the surgeon to make sure, as best he could that there was no part of the drain left in there?
 "A. If there were any reasonable doubt that the drain had not been totally removed — been removed, yes sir.
 "Q. And the standard of care would require that, would it not?
"A. Yes, sir.
"Q. Why would that be?
 "A. The drain is intended to remain in place until it serves its purpose and then it's removed. Some drains are left in longer than others, but, certainly, in this case we intended to remove the drain on the second post-operative day. If there had been any question about whether or not it had been completely removed, then other diagnostic measures would have been taken.
 "Q. And when you say other diagnostic measures would be undertaken what you're talking about, of course, is a very, very simple X-ray while the patient is there. It doesn't take but just a few minutes to take an X-ray of the neck area like it was taken seven weeks later in Judy's case, in that X-ray, if there had been part of that drain left in there on February the 8th, 1984, when Dr. Fitts attempted to remove it, that X-ray would have shown it wouldn't it?
"A. Yes, sir.
 "Q. And the standard, as you said earlier, the standard of care would require the doctor if he's got any question, any doubt, any possibility to do that X-ray. The X-ray would show it and then the surgeon would be required to remove the drain at that time.
"A. Yes."
Dr. Fitts admitted that he encountered some initial difficulty in removing the drain tube and that one end of the drain was substantially shorter than the other end at the time he removed it. Dr. Fitts admitted that although he recognized the potential that part of the drain was left in Ms. Timmerman's neck, he did not give enough thought to order an X-ray because he did not think it was necessary. He stated that it was his opinion that an X-ray was unwarranted in light of the additional radiation risk; however, X-rays for the sole purpose of detecting any remaining drain tube were made a few weeks later and then the remaining portion of the tube was surgically removed.
After thoroughly examining the record, we find that the plaintiff properly utilized the testimony of the defendant doctors to establish the appropriate standard of care as to the proper use, purpose, insertion, and removal of a drainage tube. There is no requirement that the plaintiff produce an independent expert where the testimony of the defendant, as here, establishes the standard required of him by his profession. Furthermore, there was evidence which, if believed by the jury, would have been sufficient to support a finding that the duty to use due care in the removal of the drainage tubes had been breached. Therefore, the judgment of the trial court, insofar as it was based upon the directed verdict in favor of Dr. Fitts, is due to be reversed. Additionally, insofar as the judgment was based on the directed verdict in favor of Surgical Associates, it must be *Page 914 
reversed since it was granted on the ground that the principal could not be liable because there was no agent liability, and that ground is not viable, in light of our holdings as to the doctors.
For all of the foregoing reasons, the judgment based upon the directed verdicts in favor of Dr. Fitts, Dr. Stuhr, and Surgical Associates is reversed.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, ADAMS and STEAGALL, JJ., concur.
[1] Subsequent to the filing of the complaint, Ms. Timmerman was married and at the trial she was known as Judy Timmerman Bell. We will continue to refer to her as Ms. Timmerman for consistency and clarity.