This is an appeal from a judgment rendered on a jury verdict awarding Charles R. Stevens $700,000 in his medical malpractice action against Dr. Kenneth E. Ellingwood, M.D.
In 1985 Stevens was scheduled for abdominal surgery. During preparations for that surgery, his doctor discovered a cancerous tumor at the base of his tongue. The tumor was surgically removed and Stevens *Page 933 
was advised to undergo radiation therapy to prevent any spread or recurrence of the cancer. Stevens was referred to the appellant, Dr. Kenneth E. Ellingwood, M.D., a radiation oncologist, for treatment. Dr. Ellingwood planned a course of radiation therapy that would last approximately six and one-half weeks. Under the plan, Stevens was to receive a total dosage of approximately 6600 rads of radiation, delivered to portions of his head and neck in increments of approximately 200 rads per day.[1]
He was to receive certain treatments by which he would be exposed to 4600 rads with his spinal cord unshielded. Those treatments, where Stevens's spinal cord was purposely in the field of radiation, were called "on cord" treatments. For the final portion he was to receive a total of 2000 rads, during which his spinal cord was to be shielded by a number of specially prepared blocks that were designed to prevent any radiation from reaching it. Those treatments were referred to as "off cord" treatments. That plan was implemented, and Stevens completed the course of radiation therapy under Dr. Ellingwood's care.
Approximately nine months after Stevens received his last treatment, he began to have problems with walking and coordination. His condition continued to deteriorate until he lost the use of both of his legs and his right arm. He retained partial use of his left arm.
Stevens filed a complaint against Dr. Ellingwood and another radiation oncologist who had been involved in his treatment.[2] His complaint alleged, inter alia, that Dr. Ellingwood had been negligent in administering the radiation treatments, allowing Stevens's spinal cord to be exposed to excessive radiation during the treatment sessions that were supposed to be "off cord." Stevens alleged that Dr. Ellingwood's negligence caused his quadriparesis.
Several expert witnesses testified at trial, including Dr. John T. Mallams, a radiation oncologist. Dr. Mallams's competency to testify as an expert on the medical issues was not challenged by Dr. Ellingwood. He testified that he was very familiar with the type of treatment that Dr. Ellingwood had administered to Stevens and with the standard of care that was required of radiation oncologists that performed that type of treatment. He testified that, in his professional opinion, the evidence that he had reviewed revealed that the blocks that were prepared to shield Stevens's spinal cord had not been properly positioned during his treatment. That evidence, which included a number of specially prepared X-rays that were taken during Stevens's treatment, revealed that his spinal cord had been in the field of radiation during the planned "off cord" treatments. Dr. Mallams further testified that the excessive exposure of Stevens's spinal cord was the result of a number of errors of omission and errors of commission in the placement of the blocks and in Dr. Ellingwood's apparent failure to verify that the blocks were in place and performing properly. He stated that those errors caused Stevens's spinal cord to receive in excess of 6000 rads of radiation, instead of the planned 4600 rads. He said that this excessive exposure was almost certainly the cause of the neurological deficit experienced by Stevens. Finally, Dr. Mallams stated that the treatment rendered to Stevens by Dr. Ellingwood fell below the standard of care required of physicians in his field "any place in the United States."
Additional testimony was received from Dr. Kenneth Steidley, a medical physicist. Dr. Steidley is not a physician. Portions of Dr. Steidley's testimony were objected to by Dr. Ellingwood. Dr. Steidley testified that he had an undergraduate degree in physics from Ohio University, and had received both a master's degree in radiation science and a doctorate in environmental *Page 934 
science with a specialty in radiation science from Rutgers University. He stated that he was certified by the American Board of Health Physics and the American Board of Radiology and had held the position of chief physicist at the St. Barnabas Medical Center in Livingston, New Jersey, since 1975. His duties at St. Barnabas included supervising other physicists in the department of radiation therapy who are responsible for ensuring that the radiation therapy plans prescribed by radiation oncologists are delivered correctly. Dr. Steidley testified that, in his opinion, 4000 rads is recognized as the maximum dose that the spinal cord should receive during radiation therapy. He also testified that his review of the X-rays taken during Stevens's treatment revealed that Stevens's spinal cord was in the field of radiation during treatment sessions that were supposed to have been "off cord."
Dr. Ellingwood contends that those answers constituted testimony as to the standard of care owed by radiation oncologists. This Court has held that testimony defining the standard of care owed by a physician, or a breach thereof, must be provided by an expert medical witness, unless the breach is so apparent as to be within the comprehension of the average layman. Timmerman v. Fitts, 514 So.2d 907 (Ala. 1987); Dobbs v.Smith, 514 So.2d 871 (Ala. 1987). Standard of care testimony is testimony concerning the degree of competency required of a professional, and it usually addresses whether the defendant in a particular case breached that standard. See S. Pegalis and H. Wachsman, American Law of Medical Malpractice § 11.4 (1981). Dr. Steidley's testimony concerned objective, scientific facts that were within his area of expertise and did not address the standard of care owed by a physician or other professional.
Dr. Ellingwood argues that the case of Bell v. Hart,516 So.2d 562 (Ala. 1987), requires a reversal of the judgment against him. In Bell this Court upheld a summary judgment for the defendant doctor, holding that the trial court did not abuse its discretion in excluding the testimony of a psychologist and a pharmacist because they were not competent to testify as experts on the standard of care required of physicians in prescribing the drug Elavil.
In Bell, this Court concluded:
 "We are of the opinion that unless the conduct complained of is readily ascertainable by lay persons, the standard of care must be established by medical testimony. 'Medical testimony' means testimony by physicians or properly introduced medical treatises that are recognized as authoritative and standard works in the medical profession.
 "Although both Fisher [a pharmacist] and Miller [a psychologist] are shown to be highly qualified experts in their fields of study, we cannot permit them to testify whether a medical doctor followed the proper standard of care in prescribing the drug Elavil. Neither was shown to be authorized to prescribe the drug. While their knowledge of the drug and its effect on the human body may or may not be greater than that of a medical doctor authorized by law to prescribe the drug, we cannot permit a nonphysician, who cannot legally prescribe a drug, to testify concerning the standard of care that should be exercised in the prescription of the drug.
 "Finding no applicable exceptions to the general rule that proof as to what is or is not proper practice, treatment, and procedure can be established only by expert medical evidence, we conclude, as did the trial court, that summary judgment was appropriate. We would point out that appellants made no attempt to introduce any evidence from another medical doctor regarding this case, and the defendant raised at every opportunity this failure of proof."
516 So.2d at 570. Unlike the evidence in Bell, the standard-of-care evidence in this case was given by a qualified physician. Dr. Mallams, a radiation oncologist, is a medical doctor and is qualified in the same specialty as defendant Dr. Ellingwood.
Furthermore, unlike the excluded testimony in Bell, the evidence sought by the questions put to Dr. Steidley involved matters *Page 935 
of science, specifically, radiation biology. His responses were well within his area of expertise, and such expert testimony is sanctioned by the legislature:
 "The opinions of experts on any question of science, skill, trade or like questions are always admissible, and such opinions may be given on the facts as proved by other witnesses."
Ala. Code 1975, § 12-21-160.
The question of whether a particular witness will be allowed to testify as an expert, and the scope of that expert testimony, are largely discretionary with the trial court, and that decision will not be disturbed on appeal without a showing of palpable abuse. Maslankowski v. Beam, 288 Ala. 254,259 So.2d 804 (1972). Because Dr. Steidley did not testify as to the standard of care owed by Dr. Ellingwood, and in light of his extensive education in the area of radiation science and years of experience in the field of medical physics, this Court finds no abuse of discretion by the trial judge in determining that Dr. Steidley was qualified to testify.
Dr. Ellingwood also objected to Dr. Steidley's opinion testimony concerning whether Stevens's spinal cord was in the field of radiation during the "off cord" treatments on the ground that such determinations were outside Dr. Steidley's area of expertise. Dr. Steidley's opinion was based on his review of a number of "port films" taken during Stevens's radiation treatments. Port films are special X-rays taken during the course of radiation therapy that show whether the patient's spinal cord is being properly shielded during the "off cord" treatments. The testimony that Dr. Ellingwood complains of is reproduced, in pertinent part, below:
 "Q. Dr. Steidley, before we took a recess I think I had asked you, based on your education, training and experience and review of these films and X-rays, do you have an opinion as to how much radiation Mr. Stevens received to his spinal cord?
"A. Yes, I do.
"Q. And what is that opinion?
 "A. Approximately six thousand and six hundred rads.
"Q. What is the basis of your opinion, Doctor?
 "A. The cord received approximately forty-six hundred rads before they went off cord. That was part of the intended treatment. The actual number was listed on the chart at four thousand four hundred and eighty-eight.
 "Q. Now, that's before they went off cord with the new block?
"A. Before they went off cord with the new block.
"Q. Okay.
 "A. And then they made eleven more treatments of approximately two hundred rads each to the midline of the patient in question and I believe by looking at these two films that the spinal cord is within this radiation field. So it got those additional two hundred rads a day times eleven days, another twenty-two hundred rads. So you add that twenty-two hundred rads to the amount they gave, forty-four eighty-eight, and you get sixty-six eighty-eight, which I just called sixty-six hundred just to keep it simple.
 "Q. So in your opinion, he received six thousand six hundred and eighty-eight rads?
"A. Right.
 "Q. What is it about these films that leads you to believe that the cord is within the field of radiation, Doctor?
 "A. Well, we have structures here that we can easily identify. Then we have air column and we have the junction between the vertebral bodies and the spinal processes here which is where we know the cord is. So we know on this film where the air column is and we know where the spine is. On this film we know where the air column is, so we can simply take a measurement here. And I'll do that if you'd like. Place it over here and find out where the cord should be."
(Emphasis added.)
During voir dire, Dr. Steidley conceded that in three of the four port films he *Page 936 
reviewed he could not make out the vertebral bodies containing the spinal cord. However, he states that he could identify Stevens's air column in each port film, and, using that as a point of reference, was able to determine the location of Stevens's spinal cord. Dr. Ellingwood argues that that sort of measurement was beyond Dr. Steidley's qualifications and is the sort of determination reserved for medical doctors. In addition, Dr. Ellingwood argues that Dr. Steidley's method of determining the location of the spinal cord was crude and unreliable.
The fact that Dr. Steidley is not a medical doctor does not necessarily preclude him from offering opinion testimony based on his review and evaluation of the port films. An expert witness is one with "such knowledge, skill, experience, or training . . . that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined." C. Gamble, McElroy's Alabama Evidence § 127.01(5) (3d ed. 1977). Due to Dr. Steidley's extensive education and practical experience in radiation science, including reviewing port films, his knowledge exceeds that of the average juror or witness, and he was therefore competent to testify as an expert. Hulcher v. Taunton, 388 So.2d 1203, 1206 (Ala. 1980). Any objection Dr. Ellingwood has to Dr. Steidley's testimony that is based on Dr. Steidley's alleged lack of knowledge goes to the weight rather than to the admissibility of that testimony. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala. 1979). In view of the facts of this case, the trial judge's decision to allow Dr. Steidley to offer an expert opinion concerning whether Stevens's spinal cord was within the field of radiation during the "off cord" treatments was not an abuse of discretion, and it will not be disturbed by this Court. Meadows v. Coca-Cola Bottling, Inc.,392 So.2d 825 (Ala. 1981).
Finally, Dr. Ellingwood contends that the trial court erred by allowing the jury to view a videotape depicting a day in Stevens's life. Dr. Ellingwood argues that all of the facts established by the videotape were testified to by witnesses, and, therefore, that the tape was cumulative and served only to prejudice the jury. Dr. Ellingwood urges this Court to adopt the policy set forth by the United States District Court for the District of Maine in Bolstridge v. Central Maine Power Co.,621 F. Supp. 1202 (D.Me. 1985). That court held that such a videotape should be admitted only when the tape conveys information to the jury more accurately or more thoroughly than a witness can through testimony. Bolstridge, supra, at 1204. We decline to adopt this inflexible rule. In this jurisdiction, motion pictures are admissible if they are shown to be relevant and to accurately depict the subject matter, and if they tend to aid rather than confuse the jury. Those determinations are left to the sound discretion of the trial court and will not be reversed except for abuse of discretion. International Union,etc. v. Russell, 264 Ala. 456, 88 So.2d 175 (1956) aff'd,356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); Molina v. State,533 So.2d 701 (Ala.Cr.App. 1988), cert. denied, ___ U.S. ___,109 S.Ct. 1547, 103 L.Ed.2d 851 (1989). Dr. Ellingwood has not demonstrated such abuse; therefore, the trial court's determination will not be disturbed.
After a review of the record, this Court has found no reversible error by the trial court. Therefore, the judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and ADAMS, JJ., concur.
JONES, J., concurs in the result.
[1] The term "rad" is an acronym for "radiation absorbed dose." It is a unit of measurement of the absorbed dose of ionizing radiation. See The Sloane-Dorland Annotated Medical-LegalDictionary 599-600 (1987).
[2] A summary judgment was entered in favor of the second physician, and he had no further involvement in this case.