Darden Bridgeforth and certain others; Fleming Farms,[1] and Lacey's Spring Farms, Inc.; and Brown Farms, a partnership, et al., as plaintiffs in three separate actions, appeal from a summary judgment in each case for the defendant Dixie Ag Supply, Inc., on the plaintiffs' claims alleging breach of express and implied warranties, breach of contract, and liability under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").[2] We affirm.
The actions were filed after June 11, 1987; therefore, the applicable standard of review of these summary judgments is the "substantial evidence" rule. See Ala. Code 1975, § 12-21-12, andWest v. Founders Life Assurance Co. of Florida, 547 So.2d 870
(Ala. 1989). Viewing the evidence in the light most favorable to the plaintiffs, the nonmoving parties, as required under our applicable standard of review, we assume that the following occurred:
The plaintiffs are individuals, corporations, and partnerships engaged in cotton farming operations in Limestone County, Alabama. Dixie Ag, a wholly owned subsidiary of ConAgra, Inc., is a distributor of agricultural products and serves an area throughout North Alabama.
Around the first of June 1990, the plaintiffs purchased from Dixie Ag a product known as Super Shot 40 for use on cotton during the 1990 crop year. Super Shot 40 was manufactured by CropChem, Ltd., a corporation whose principal place of business was in Decatur, Illinois. Super Shot 40 was mixed at CropChem and shipped by truck to distributors in 2 1/2-gallon plastic jugs, packaged two jugs to a cardboard box. The tops of the jugs were closed "hand tight" and had no protective seal. The boxes in which the jugs were packaged were taped closed and several of the boxes were then stacked on a wooden pallet and "shrink wrapped" in clear plastic. No one produced a product similar to Super Shot 40, and Dixie Ag was the only distributor of Super Shot 40 in North Alabama.
The plaintiffs first learned of Super Shot 40 from information provided by Dixie Ag, which promoted Super Shot 40 as a "safener" — a product designed to reduce the adverse effect of chemicals used on cotton. Dixie Ag sold Super Shot 40 to the plaintiffs, using the label to describe the goods being sold, and the label identified the product as a "safener" and disclosed the percentage of active and inactive ingredients. Employees of Dixie Ag told the plaintiffs what Super Shot 40 would do, instructed them how to use it, and provided them with directions as to the rate for applying it. Dixie Ag told the plaintiffs that when mixed with certain herbicides, MSMA and DSMA, Super Shot 40 would reduce injury to cotton that occurs when these herbicides are used to control cockleburs and Johnsongrass. In fact, the only function of Super Shot 40 was to reduce damage from other chemicals, and this, the plaintiffs say, was the only reason they purchased the product.
Each shipment of Super Shot 40 was either picked up at Dixie Ag by the plaintiffs or was delivered by Dixie Ag to them and each shipment was accompanied by an invoice *Page 924 
showing what was received, when it was received, and who received it. The plaintiffs or their employees signed most of these documents, although some of the documents were signed by employees of Dixie Ag and some were not signed. The signature blank on the invoice, classified as a "receipt," contained the language: "Received in Acceptable Condition."
The invoices/receipts accompanying the Super Shot 40, and received by the plaintiffs, contained the following language:
"WARRANTY DISCLAIMER
 "SELLER IS A DISTRIBUTOR OF PRODUCTS MANUFACTURED AND WARRANTED BY OTHERS. THE GOODS SOLD TO YOU BY THIS INVOICE AND CONTRACT ARE FURNISHED 'AS IS' BY SELLER AND ARE SUBJECT ONLY TO THE MANUFACTURER'S WARRANTIES WHICH APPEAR ON THE LABELS OF THE PRODUCTS SOLD TO YOU.
 "SELLER MAKES NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.
"LIMITATION OF LIABILITY
 "In no event shall seller be liable for special, incidental, or consequential damages, or for damages in the nature of penalties.
 "Seller shall not be liable to dealer or, by way of indemnification, to customers of dealers for any damages, sums of money, claims or demands whatsoever, resulting from or by reason of, or arising out of, the misuse, or the failure to follow label warnings or instructions for use, of the products sold by seller to dealer. Conflicts between seller's invoice or delivery ticket and dealer's purchase order regarding issues of liability shall be treated separately and the voidance of such provisions shall not affect the other terms or conditions on the invoice."
Several weeks after applying the herbicide DSMA, mixed with Super Shot 40, the plaintiffs discovered that some of their cotton had the characteristic damage of herbicide 2-4, D, a selective herbicide that is highly toxic to cotton.
Dixie Ag was involved in investigating the damage to the plaintiffs' cotton. Based on its investigation, Dixie Ag's local manager testified that a pattern emerged showing that the damage to the cotton was caused by the highly toxic herbicide 2-4, D, which Dixie Ag says was found in the drums that G.S. Robins and Company had delivered to CropChem, Ltd., to be filled with Super Shot 40. The investigation also revealed that the damage to the cotton had occurred only when Super Shot 40 was used. Tests conducted by the Alabama State Department of Agriculture and Industries confirmed that the herbicide 2-4, D, was present in the Super Shot 40 applied to the plaintiffs' cotton.
Although the plaintiffs received no written warranty from Dixie Ag, they claim that the statements by employees and officers of Dixie Ag concerning the nature and purpose of Super Shot 40 and their reference, by way of description, to the label on the jug of the product constituted an affirmation of fact or promise and became part of the basis of the bargain and, therefore, created an express warranty that Super Shot 40 was a "safener" and would reduce damage to their cotton.
Dixie Ag maintains that the evidence the plaintiffs presented in support of their claim is no more than general testimony, i.e., general descriptions of promotional activities of Dixie Ag and general explanations of the design and purpose of Super Shot 40 to "safen" the use of certain herbicides on cotton — descriptions and explanations that Dixie Ag contends do not give rise to an express warranty.
Section 7-2-313, Ala. Code 1975, provides:
 "(1) Express warranties by the seller are created as follows:
 "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
 "(b) Any description of the goods which is made part of the basis of the *Page 925 
bargain creates an express warranty that the goods shall conform to the description.
". . . .
 "(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."
In substance, the evidence presented by the plaintiffs, as set out above, establishes that after Dixie Ag told them that Super Shot 40 would reduce the adverse effect of certain herbicides used on cotton, the plaintiffs purchased it to reduce injury to their cotton. Therefore, the plaintiffs presented substantial evidence of the existence of an express warranty under the provision of § 7-2-313, so as to preclude the entry of a judgment for Dixie Ag as a matter of law on the theory that there was no express warranty. See VanAntwerp-Aldridge Drug Co. v. Schwarz, 263 Ala. 207,82 So.2d 209 (1955), an action against a drug company for the loss and destruction of certain pecan trees owned by the plaintiff; this Court affirmed a judgment based on a jury verdict for the plaintiff, holding that there was sufficient evidence from which the jury could have found the creation of an express warranty when an employee of the drug company sold a chemical compound to the plaintiff/buyer with the statement that the chemical would keep caterpillars off his trees and would be good for the trees-that the compound would be a good, safe, and efficient compound for the purposes for which he wished to buy it. See also Ryan v. Charles Townsend Ford, Inc., 409 So.2d 784
(Ala. 1982).
As a defense to the plaintiffs' claims alleging breach of express warranty, Dixie Ag offered into evidence the "warranty disclaimer" heretofore set forth, maintaining that it was a "conspicuous, effective warranty disclaimer" and properly excluded any warranty that could have been created.
However, § 7-2-316(1) provides:
 "(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (Section 7-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable."[3]
Having determined that the issue pertaining to the creation of an express warranty was a fact question for the jury, we cannot hold that the warranty disclaimer operated, as a matter of law, to exclude such an alleged warranty.
However, Dixie Ag also offered into evidence the limitation of liability clause, heretofore set out, which immediately followed the warranty disclaimer clause on the invoices/receipts, asserting that clause as a general defense to all claims of the plaintiffs for consequential or incidental damages.[4]
Alabama law specifically allows for a limitation for remedies or damages: Section 7-2-316(4) provides:
 "(4) Remedies for breach of warranty can be limited in accordance with the provisions of this article on liquidation or limitation of damages and on contractual modification of remedy. (Sections 7-2-718 and 7-2-719)."
Section 7-2-719(3) provides:
 "(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of *Page 926 
consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."
"Consequential damages resulting from the seller's breach" has been defined to include: "Injury to . . . property proximately resulting from any breach of warranty." §7-2-715(2)(b).
Thus, as permitted by § 7-2-316(4), and § 7-2-719(3), Dixie Ag attempted to contractually limit the plaintiffs' remedies for breach of warranty.
In Southland Farms, Inc. v. Ciba-Giegy Corp., 575 So.2d 1077
(Ala. 1991), the United States Court of Appeals for the Eleventh Circuit certified to this Court a question asking whether, under Alabama law, a disclaimer of consequential damages in the sale of agricultural products was reasonable and precluded recovery of such damages. Southland Farms, a corporation engaged in growing and marketing potatoes, purchased a product designed to prevent nut grass and potato rot. After using the product on its potato fields, the corporation experienced damage to a portion of its crop caused by nut grass and potato rot. The product was sold with a label that contained instructions for use, a warranty disclaimer, and a limitation of liability clause. In upholding the limitation of liability clause excluding consequential damages, this Court, recognizing the public policy allowing a seller to limit the remedies available to a buyer, stated:
 "The Uniform Commercial Code recognizes the validity of a limitation or exclusion of consequential damages where the loss is commercial. [Quoting § 7-2-719(3).]
". . . .
 "Where a provision excluding consequential damages is so widely used and accepted in a particular trade that it can be characterized as a 'usage of trade,' it has been found to be reasonable. Comment 6 to § 7-1-205 makes it clear that a contract clause resting on 'usage of trade,' while not immune from a charge of unconscionability, is prima facie 'reasonable' due to its broad-based commercial acceptance:
 " '6. The policy of this Act controlling explicit unconscionable contracts and clauses (Sections 7-1-203, 7-2-302) applies to implicit clauses which rest on usage of trade and carries forward the policy underlying the ancient requirement that a custom or usage must be 'reasonable.' However, the emphasis is shifted. The very fact of commercial acceptance makes out a prima facie case that the usage is reasonable, and the burden is no longer on the usage to establish itself as being reasonable. But the anciently established policing of usage by the courts is continued to the extent necessary to cope with the situation arising if an unconscionable or dishonest practice should become standard.'
 "Agricultural chemicals are sold, on an industry-wide basis, subject to an exclusion of liability for consequential damages. . . . Clauses excluding consequential damages are permitted under the U.C.C. because they are an allocation of unknown or undeterminable risks. Comment 3, § 7-2-719.
". . . .
 ". . . [A] consequential damages exclusion in the commercial context of the sale of agricultural chemicals is an accepted method of risk-shifting in the industry."
575 So.2d at 1079-81. (Emphasis added.) (Hornsby, C.J., and Maddox, Shores, Adams, Houston, Steagall, Kennedy, and Ingram, JJ., concurring.)
Dixie Ag made a prima facie showing that the limitation of liability clause was not unconscionable; this showing shifted the burden to the plaintiffs to present substantial evidence to the contrary, so as to create a genuine issue of material fact. This they failed to do. Therefore, we must conclude that the limitation of liability clause was not unconscionable and, consequently, that it precludes the recovery of consequential damages. Therefore, the summary judgment was proper for Dixie Ag on the plaintiffs' claims alleging breach of express warranty.
The plaintiffs also maintain that there was a genuine issue of fact as to whether Dixie Ag breached the implied warranties of merchantability *Page 927 
and fitness for a particular purpose. Ala. Code 1975, §§7-2-314, 7-2-315.
Dixie Ag contends that it complied with Ala. Code 1975, §7-2-316(2) and (3), and, therefore, disclaimed any implied warranties that could have arisen out of the sale of Super Shot 40 to the plaintiffs.
Sections 7-2-316(2) and (3) provide:
 "(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'
"(3) Notwithstanding subsection (2):
 ' "(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; . . . ."
Section 7-1-201 defines "conspicuous":
 "(10) 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. . . . Whether a term or clause is 'conspicuous' or not is for decision by the court."
In this case, the invoices/receipts were identical in form, and in all of them the term "WARRANTY DISCLAIMER" appeared in the center of the form, immediately below the line for a signature acknowledging receipt; the term "WARRANTY DISCLAIMER" was in capital letters and in bold print — print that was larger and darker than all of the other print on the form except for the name of Dixie Ag at the very top. Also, the provisions immediately following the heading "WARRANTY DISCLAIMER" were printed in capital letters, which were larger than other letters on the form. This clearly meets the requirement of § 7-2-316(2) that a warranty disclaimer, to be effective, be "conspicuous." See Fincher v. Robinson BrothersLincoln-Mercury, Inc., 583 So.2d 256 (Ala. 1991). Accordingly, the summary judgment for Dixie Ag was proper as to the plaintiffs' claims alleging breach of implied warranties.
The plaintiffs also contend that Dixie Ag "breached a contractual obligation to determine whether or not [CropChem] was financially able to compensate the [plaintiffs] for any loss proximately resulting from the use of the product sold." We find that argument to be without merit.
Suffice it to say that the record contains no evidence of a contract between the parties that imposed on Dixie Ag a duty to determine or ensure the sound financial condition of CropChem, and it contains no evidence that the plaintiffs bargained for, or relied on, any promise of Dixie Ag that Super Shot 40 was protected by warranties of others. The summary judgment for Dixie Ag on the plaintiffs' breach of contract claim was proper.
The plaintiffs further maintain that Dixie Ag's summary judgment was improper as to their AEMLD claim. They maintain that whether Dixie Ag is liable under the AEMLD is a question of fact for the jury, just as, they say, Dixie Ag's affirmative defense of lack of causal connection is.
Under the lack-of-causal connection defense, a defendant may establish that there is no causal relation in fact between the defendant's activities in handling the product and the product's defective condition.
 "For example, the defendant may show that he is in the business of either distributing or processing for distribution finished products; [that] he received a product already in a defective condition; [that] he did not contribute to this defective condition; [and that] he had neither knowledge of the defective condition, nor an opportunity to inspect the product which *Page 928 
was superior to the knowledge or opportunity of the consumer."
Atkins v. American Motors Corp., 335 So.2d 134, 143 (Ala. 1976).
 "The 'superior opportunity' must be a meaningful one. If the defect was latent and could not have been discovered by either consumer or distributor by a reasonable inspection, neither had a superior opportunity."
Consolidated Pipe Supply Co. v. Stockham Valves Fittings,Inc., 365 So.2d 968, 971 (Ala. 1978).
The plaintiffs concede that the defect was "latent" and "could not have been discovered by [them] through [a] reasonable inspection." Furthermore, the facts of this case establish that Dixie Ag only distributes finished products; that it received the Super Shot 40 in a sealed container; that at no time did any employee of Dixie Ag open or remove the cap on the product and that no container was opened while in the possession or custody or control of Dixie Ag; that when Dixie Ag received the product it was already defective and that Dixie Ag did not contribute to the product's defective condition; that Dixie Ag sold the product to the plaintiffs in the sealed container in the defective condition; that it had no knowledge of the defective condition of the product when it sold the product; that it had no opportunity to inspect the product that was greater than the opportunity of the plaintiffs; and that the product was not determined to be defective until after it had been applied to the cotton.
Based on the foregoing, we conclude that the summary judgment for Dixie Ag was also proper as to the plaintiffs' AEMLD claim.
AFFIRMED.
HORNSBY, C.J., and MADDOX, KENNEDY and COOK, JJ., concur.
[1] The record does not indicate whether "Fleming Farms" is a corporation, a partnership, or a proprietorship.
[2] The other named defendants in these actions were CropChem, Ltd.; G.S. Robins and Company; Texaco Chemical Company; Drumtech, Inc.; and Mission Petroleum Carriers. The trial court entered summary judgments for Texaco Chemical Company and Mission Petroleum Carriers, from which there is no appeal. It dismissed Drumtech, Inc., and there is no appeal from that dismissal. It denied a summary judgment for G.S. Robins. The claims are still pending against CropChem, Ltd., and G.S. Robins.
[3] We note that evidence of the oral statements made the basis for the creation of the express warranty was introduced without objection and without a motion to strike it.
[4] A disclaimer of warranties and a limitation of remedies are in substance the same, although they are conceptually different. See Massey-Ferguson, Inc. v. Laird, 432 So.2d 1259 (Ala. 1983). A disclaimer of warranties reduces the circumstances in which the seller would be liable for breach of contract; a limitation of remedies restricts the remedies available once a breach is established. See Burbic Contracting Co. v. Cement AsbestosProducts Co., 409 So.2d 1 (Ala. 1982).