CRAWLEY, Judge.
On July 17, 1991, Thomas Miller sued Pet-tibone Corporation (the “corporation”) and other defendants, alleging various claims arising out of difficulties Miller had experienced with a Barko 775 feller buncher, manufactured by the corporation. Miller amended his complaint several times and dismissed various defendants from the action. When the case proceeded to trial, the only claims at issue involved breach of express warranty, breach of implied warranty, revocation of acceptance, negligent repair, and negligent training of repair personnel.
At the close of Miller’s case in chief, the corporation moved for a directed verdict as to each claim of the complaint. After considering the motion and arguments of counsel, the trial court granted the motion for directed verdict as to each count of the complaint. The court entered a judgment on the directed verdict. Miller filed a post-judgment motion, which was denied. Miller appealed to our Supreme Court, which transferred the case to this court pursuant to Ala.Code 1975, § 12-2-7(6).
We note at the outset that a feller buncher is a piece of equipment used in the logging industry to cut and bunch trees. The feller buncher at issue in this case was manufactured by Barko Hydraulics, a division of the corporation. Miller purchased the feller buncher from Kennemer Manufacturing, Inc., an authorized Barko dealer. The hydrostatic transmission unit contained on the feller buncher was manufactured by Sauer-Sundstrand Company. The feller buncher Miller purchased was equipped with a sheer head rather than a saw head. Miller had requested the sheer head because it was less expensive to operate than a saw head was.
Miller alleges numerous instances in which the feller buncher experienced mechanical and operational failures: a large hose “blew *1368 off’ the machine, and he repaired it; the shear head blades had a problem, and Ken-nemer sent new blades; the hydrostat experienced several problems, which Kennemer repaired on a few occasions; the radiator leaked, and Kennemer replaced it; the injectors “went out,” and Kennemer replaced them; the main diesel engine “went out,” and the engine was rebuilt; and the hydraulic system experienced problems. Following-numerous hydrostatic failures, Miller alleged, he took the feller buncher to a garage; it remained there for approximately four years. The machine was later transported to a Bar-ko dealership, where a Barko representative disassembled it and inspected parts of the machine.
Before the last hydrostatic failure, Miller alleged that a Barko service manager, Ed Cass, telephoned Miller to inform him that he owed $6,000 or $7,000 for some of the hydrostats that had been replaced. Miller alleged that Cass told him that these repairs had been denied under the warranty. Miller claims that he requested that Cass or someone else from Barko come and repair the machine, but that no one ever did.
Miller testified at trial that if the machine had been in the condition as warranted, the machine would have been worth the price he paid for it — $107,590; however, he claimed, the value of the machine in its defective condition was substantially less — $10,000.
Miller argues that the trial court erred in granting the corporation’s motion for directed verdict.
In reviewing a directed verdict, we must determine whether the nonmoving party presented substantial evidence in support of his or her claim. Lemond Construction Co. v. Wheeler, 669 So.2d 855 (Ala.1995); Smith v. Vice, 641 So.2d 785 (Ala.1994); Dial v. Dial, 603 So.2d 1020 (Ala.1992). “A verdict is properly directed only where there is a complete absence of proof on a material issue or where there are no disputed questions of fact for the jury to determine.” K.S. v. Carr, 618 So.2d 707, 713 (Ala.1993). Furthermore, on review of a directed verdict, no presumption of correctness attaches to the trial court’s ruling. Id.

Motion for Directed Verdict

A. Breach of Express Warranty

Miller’s complaint asserted two claims alleging breach of warranty: one alleging breach of the Pettibone warranty and one alleging breach of the Sauer-Sundstrand warranty (“SS warranty”). These claims are grounded upon Miller’s alleged complaints regarding the hydrostatic transmission. The claim alleging breach of the Pettibone warranty asserts that the feller buncher had certain defects in materials and workmanship that were discovered within the warranty period, specifically repeated hydrostatic transmission failures, and more specifically, failures of the hydrostat motors and pumps. In his claim alleging breach of the SS warranty, Miller asserts that the corporation had failed and refused to repair the feller bunch-er as provided in the hydrostatic transmission warranty policy and that the hydrostatic transmission is still in a defective condition. Miller did not claim in the complaint or at trial that other pz'oblems he had experienced with the feller buncher gave rise to any claim of breach of warranty.
Miller failed to produce substantial evidence that Pettibone breached its express warranty. The Pettibone warranty states:
“Pettibone will cause any part of a Petti-bone product covered by this warranty which proves to be defective in material or workmanship within six (6) months or 1,000 hours, whichever occurs first from [the] first day in service ... to be replaced without charge with a new or repaired part, at Pettibone’s election. Pettibone also will cause the labor to remove any such defective part and to install the new or repaired part to be provided without charge to the owner of said Pettibone product. The parts and labor to meet this warranty will be furnished by Pettibone distributor designated by Pettibone.
“Pettibone’s warranty does not cover:
“9. Engines, transmissions and components, ... not manufactured by Pettibone. The warranty of the respective manufac *1369 turers of these components shall apply to said items unless said manufacturers make no warranty with respect to said items, in which event Pettibone’s warranty shall apply-
“THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, STATUTORY, WRITTEN OR ORAL, AND THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.”
As stated, the Pettibone warranty warrants the feller buneher manufactured by Pettibone to be free from defects in material and workmanship; however, the warranty excludes from its coverage transmissions not manufactured by Pettibone. The Pettibone warranty further provides that the warranties of the respective manufacturers of the components apply to these items. Therefore, we conclude that the corporation did not breach its warranty, because the warranty specifically excludes transmissions.
Assuming, arguendo, that the Petti-bone warranty could apply to the hydrostatic transmission problem, the warranty is limited to repair or replacement of parts determined to be defective in material or workmanship. Miller testified that most of the hydrostatic problems were corrected by the corporation either by repair or replacement. Miller did not produce substantial evidence to show that the other problems with the hydraulic system resulted from a defect in the material or workmanship of the hydraulic system. Moreover, Miller denied the corporation’s request to inspect the feller buneher until 10 days before trial, when the trial court ordered Miller to allow the corporation to inspect the machine. Therefore, the corporation was unable to inspect the machine to determine if a warranty claim had occurred and, by removing the hydrostat and having it disassembled, Miller prevented the corporation from ever being able to determine if the unit was defective in material or workmanship. Miller failed to offer substantial evidence that the corporation breached its warranty; therefore, the trial court correctly granted the corporation’s motion for directed verdict on the breach of warranty claim with respect to the Pettibone warranty.
The SS warranty covered the hydrostatic transmission system of the feller buneher; that warranty states in pertinent part:
“Sundstrand 36 series pumps and VII-160 motors shall be warranted to the original owner for a period of 24 months from in-service date of the machine. During the first 6 months or 1,000 hours, Bar-ko/Sundstrand, will determine if units are warrantable.... After the first 6 months or 1,000 hours, component warranty will be determined by Sundstrand.... It shall be the option of Barko and/or Sundstrand to replace any failed units with genuine Sundstrand rebuilt units. Such units may be replaced more than once during the warranty.”
Miller also failed to introduce substantial evidence that the corporation breached the express SS warranty. It is undisputed that with one exception, every problem with the hydrostatic transmission was promptly addressed by the corporation or its representative. The hydrostatic motor shuttle valve was repaired under warranty, and the hydrostatic motor and pump were replaced under warranty. These were the only two hydrostatic transmission problems submitted to the corporation within the six-month warranty period.
On July 10, 1990, a hydrostatic pump was repaired and a warranty claim was submitted to the corporation by Kennemer. Pursuant to the SS warranty, the corporation forwarded the claim to Sundstrand, which denied the entire claim based upon Miller’s failure to keep the hydraulic system clean. Miller did not pay for any repair work; the corporation and Kennemer absorbed the costs. On July 18, 1990, a hydrostatic motor was damaged and a new motor was installed. Sundstrand denied this claim on the basis of improper use. The corporation and Kennemer again paid the costs, not Miller. Although Miller contends that he experienced other hydrostatic problems, he did not record these alleged problems, as he did the other problems. Miller presented no evidence that the corpora *1370 tion knew of these other alleged hydrostatic problems. Moreover, Miller testified that every time the machine had hydrostatic problems, the hydrostat had been repaired or replaced and that he never had to pay for any of the work. Cf. Rhodes v. General Motors Corp., 621 So.2d 945, 948 (Ala.1993) (summary judgment was proper on breach of express warranty claim where it. was undisputed that each time plaintiff brought vehicle in for repairs, it was repaired and the manufacturer paid the bill, not the plaintiff).
Miller failed to prove that the corporation breached the SS warranty, because he failed to offer any evidence that the one recorded hydrostatic problem, which did not occur within the six-month period, resulted from a warrantable defect in the unit. Furthermore, when the corporation requested to examine the feller buncher to determine whether the problems with the hydrostatic transmission system would be warrantable, Miller denied the requests. Accordingly, the trial court properly granted the corporation’s motion for directed verdict on Miller’s claim that the corporation had breached the SS warranty.
Miller also contends that the trial court erred in directing a verdict with respect to the express warranty claims, because, he says, the warranties failed of their essential purpose. In order to prove that a warranty failed of its essential purpose, Miller had to show either that “the dealer refused to repair or replace the engine or that the dealer did not repair the engine within a reasonable time.” Ag-Chem Equipment Co. v. Limestone Farmers Cooperative, Inc., 567 So.2d 250, 252 (Ala.1990). Miller failed to do so. The corporation and Kennemer did not refuse to repair any hydrostatic problems of which they were notified. Accordingly, the directed verdict was proper.

B. Breach of Implied Warranty

Miller failed to present substantial evidence that the corporation breached the implied warranties of merchantability and fitness for a particular purpose. First, the Pettibone warranty provides that there is no implied warranty of merchantability or fitness for a particular purpose. This disclaimer is conspicuous (written in bold capital letters) and comports with the requirements set forth in Ala.Code 1975, § 7-2-316(2), which address the exclusion of written warranties. Therefore, no implied warranty is applicable. See Fleming Farms v. Dixie Ag Supply, Inc., 631 So.2d 922, 927 (Ala.1994) (disclaimer was conspicuous because the term “Warranty Disclaimer” appeared in the center of the form, the term was in capital letters and in bold print — print that was larger and darker than all of the other print on the form).
Second, the implied warranties are inapplicable as a matter of law. Ala. Code 1975, § 7-2-314, provides, in pertinent part, that “a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.” The language of the statute clearly indicates that the implied warranty of merchantability applies when there is a contract for sale and the seller is a merchant. Miller testified that he purchased the feller buncher from Kennemer, not from the corporation. Therefore, Miller presented no substantial evidence that the implied warranty of merchantability applies to the corporation, as manufacturer, because the corporation was not the seller; Kennemer was.
Ala.Code 1975, Section 7-2-315, states:
“Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller’s skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.”
The corporation was not the seller of the feller buncher, and, therefore, no privity exists between Miller and the corporation. Thus, the implied warranties are inapplicable against the corporation. See, e.g., Wellcraft Marine v. Zarzour, 577 So:2d 414 (Ala.1990); State Farm Fire & Casualty Co. v. J.B. Plastics; Inc., 505 So.2d 1223 (Ala.1987). Miller presented no evidence that would sup *1371 port a holding that under an express warranty a manufacturer should be treated as a “seller” for purposes of the implied warranty provisions. Wellcraft Marine, 577 So.2d at 419. “Regardless of any express warranties that a manufacturer may wish to give with a product, by their very language the ... implied warranty sections apply to the seller of the product.” Id. See also Rhodes v. General Motors Corp., 621 So.2d 945 (Ala.1993).
Miller argues that the corporation could be considered the seller of the machine, based on an agency theory. Miller failed to raise this argument in the trial court. Therefore, he cannot assert this issue on appeal as a basis for reversal. See Hargrove v. Cantrell, 547 So.2d 488 (Ala.1989); AmSouth Bank, N.A. v. Spigener, 505 So.2d 1030 (Ala.1986). Accordingly, the trial court properly granted the motion for directed verdict.

C. Revocation of Acceptance

Ala.Code 1975, § 7-2-608, sets forth the conditions under which revocation of acceptance may occur. Section 7-2-608(2) provides, in part, that revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it. It is undisputed that he knew of the repeated problems with the hyd-rostat; however, he waited until after he had removed and disassembled the hydrostat to assert his revocation. This delay is unreasonable. The trial court properly granted the motion for directed verdict as to this claim.

D. Negligent Repair and Negligent Training

Miller contends that the corporation caused or allowed repairs to be made in a negligent manner and that the corporation negligently trained the Kennemer service personnel. Upon review of the record, we conclude that Miller failed to support these allegations at trial. Miller produced no evidence that the repair of the hydrostatic motors and pumps was performed in a negligent manner. Moreover, Miller failed to present any evidence that the corporation had a duty to train Kennemer’s mechanics. Further, Miller presented no evidence that the corporation breached the alleged duty. Accordingly, Miller’s allegations, without substantial proof, were insufficient to create a jury question. Therefore, the trial court properly granted the motion for directed verdict as to this claim.

Hearsay

Miller contends that the trial court erred in excluding a statement by Joe Woods, a sales representative for Barko. Miller testified that he spoke by telephone with Joe Woods in April 1991. At trial, Miller’s counsel asked Miller what Joe Woods had told him. The corporation’s counsel objected on the basis of hearsay, and the trial court sustained the objection. Miller made an offer of proof that Woods had told Miller that Barko was not going to repair the machine anymore.
The trial court is vested with broad discretion in determining whether to admit or exclude evidence. Attalla Golf & Country Club, Inc. v. Harris, 601 So.2d 965, 969 (Ala.1992); Ryan v. Acuff, 435 So.2d 1244, 1247 (Ala.1983). The trial court’s ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of discretion. Cone Builders, Inc. v. Kulesus, 585 So.2d 1284, 1288 (Ala.1991).
The trial court’s ruling was not an abuse of discretion. Miller failed to prove that Woods was an agent of the corporation and, therefore, could bind the corporation. See C. Gamble, McElroy’s Alabama Evidence § 195.01(1) and (7) (4th ed. 1991). Additionally, Miller failed to demonstrate how this evidentiary ruling related to the trial court’s grant of the corporation’s motion for directed verdict. Accordingly, the trial court’s judgment is affirmed.
AFFIRMED.
THIGPEN, YATES, and MONROE, JJ., concur in the result.
ROBERTSON, P.J., concurs in the result only.