The plaintiff, Thomas Miller, petitioned this Court for a writ of certiorari to the Alabama Court of Civil Appeals, which was granted. He appealed from the circuit court's judgment based on a directed verdict[1] in favor of the defendant, Pettibone Corporation, at the close of the plaintiff's case. The circuit court held that Miller had failed to present substantial evidence in support of his claims alleging breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, revocation of acceptance, and negligence. The Court of Civil Appeals affirmed. Miller v. Pettibone Corp.,693 So.2d 1365 (Ala.Civ.App. 1996). Miller argues that the opinion of *Page 1374 
the Court of Civil Appeals conflicts with previous cases and that he did present substantial evidence on each count in the complaint.
The facts of this case are controverted, but, viewing the evidence most favorably to Miller, they may be summarized as follows. On July 21, 1989, Miller purchased a Barko 775 feller buncher, which is a large machine used in the forestry industry to cut and stack trees. The machine is a tractor-type vehicle, with a large shear head attached to the front to cut down trees. It is designed to cut down trees, pick them up, and stack them; using it allows loggers to save considerable time over the more traditional logging approach of using chain saws and skidders. However, a feller buncher is an expensive piece of equipment, costing over $100,000.
Miller purchased his feller buncher from Kennemer Manufacturing, Inc., a local Colbert County company with which Miller had done business for over 20 years. The Barko 775 feller buncher was manufactured by Pettibone Corporation, through its Barko Hydraulics Division.[2] Many of the component parts of the machine were manufactured by other companies, including Sauer-Sundstrand, Inc., which made the hydrostat[3] for the feller buncher. Miller called Owen Kennemer, the president of Kennemer Manufacturing, and ordered the feller buncher over the telephone. Kennemer delivered the machine to one of Miller's job sites the following week.
The Barko feller buncher was covered by two express warranties, one directly from Pettibone and another that purported to be from Barko Hydraulics and Sauer-Sundstrand. The Pettibone warranty (hereinafter "machine warranty") was a standard limited warranty that covered the entire feller buncher for defects in material and workmanship. In contrast, the Barko Service Bulletin, dated June 16, 1987, contained a warranty ("component warranty") covering the hydrostat manufactured by Sauer-Sundstrand. This warranty was given to purchasers of Pettibone machines containing Sauer-Sundstrand components. We note that there appears to have been some confusion in the circuit court as to which company — Pettibone or Sauer-Sundstrand — was bound by this warranty, but Sauer-Sundstrand left the case by a summary judgment, and the parties do not argue here that Pettibone is not bound by the warranty. The record reflects that Barko, not Sauer-Sundstrand, wrote this warranty and that it did so for all of its customers buying its products containing Sauer-Sundstrand components.
On its very first day of operation, the feller buncher burst a hose, which Miller replaced himself. From then on, during the next 21 months, the feller buncher experienced a variety of problems that would put it out of service for days at a time. The Court of Civil Appeals described the problems with the feller buncher as follows:
 "Miller alleges numerous instances in which the feller buncher experienced mechanical and operational failures: a large hose 'blew off' the machine, and he repaired it; the sheer head blades had a problem, and Kennemer sent new blades; the hydrostat experienced several problems, which Kennemer repaired on a few occasions; the radiator leaked, and Kennemer replaced it; the injectors 'went out,' and Kennemer replaced them; the main diesel engine 'went out,' and the engine was rebuilt; and the hydraulic system experienced problems. Following numerous hydrostatic failures, Miller alleged, he took the feller buncher to a garage; it remained there for approximately four years. The machine was later transported to a Barko dealership, where a Barko representative disassembled it and inspected parts of the machine."
693 So.2d at 1367-68. The final failure of the hydrostat occurred on April 18, 1991. Miller claims to have telephoned Joe Woods, a Barko sales representative, about the final breakdown of the hydrostatic transmission. Although he was not allowed to testify as to *Page 1375 
the contents of the conversation, Miller made an offer of proof that Mr. Woods told him that Barko was not going to repair the machine again. Miller then took the hydrostat to Tupelo, Mississippi, where he had another company take the hydrostat apart and rebuild it. Miller then reattached the hydrostat to the feller buncher, and it again did not work. At that point, Miller retained an attorney, who sent Pettibone a notice of breach of warranty and, subsequently, a notice of revocation of acceptance. The feller buncher sat at Fowler's garage and welding shop in Red Bay, Alabama, for approximately four years during this litigation, and it was moved to Montgomery to a Barko dealership for inspection a week before the trial.
Miller filed an action against Pettibone, among others, alleging breach of express warranty, breach of implied warranties of merchantability and fitness for a particular purpose, revocation of acceptance of the feller buncher, negligent repair, and negligent failure to train the Kennemer personnel in repairing and maintaining the feller buncher. At the conclusion of Miller's case, Pettibone moved for a directed verdict on all of Miller's claims, which the trial court granted.
In reviewing a directed verdict, this Court must determine whether the nonmoving party presented substantial evidence in support of his position. Bailey v. Avera, 560 So.2d 1038 (Ala. 1990). Also, "this Court must view all evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw." Dialv. Dial, 603 So.2d 1020 (Ala. 1992) (citation omitted).
With that standard of review in mind, we initially note that we find no error in the Court of Civil Appeals' treatment of the issues concerning the implied warranty of merchantability, the implied warranty of fitness for a particular purpose, and negligence. On the revocation of acceptance issue, we agree with Judge Yates's opinion concurring in the result. Considering the facts of this case and the lack of proof that Kennemer Corporation was the agent of Pettibone, we agree that the plaintiff failed to present substantial evidence that Pettibone could be considered the "seller" of the equipment, so as to allow Miller to revoke his acceptance. Ala. Code 1975, § 7-2-608. Accordingly, we turn to the express warranty count.
 I. Express Warranty
It is uncontested that the machine warranty in this case had expired by the time of the April 18, 1991, breakdown; accordingly, as the Court of Civil Appeals correctly held, the feller buncher itself was not under warranty.[4] However, Barko Hydraulics, a division of Pettibone, made an express warranty to Miller, and to all of its customers, covering the hydrostat.[5]
This component warranty provided *Page 1376 
coverage for the hydrostat for 24 months from the date of delivery. In this case, the final breakdown with the hydrostat occurred 21 months after delivery, which was within the period of the warranty. Therefore, we must address whether the scope of the component warranty includes the final breakdown of the hydrostat, and, if so, whether Miller is entitled to sue for breach of warranty or is limited to the repair and/or replacement of the hydrostat.
 A. Interpretation of the Warranty
Pettibone argued, and the Court of Civil Appeals agreed, that Miller had failed to present substantial evidence of any "warrantable defect" in the hydrostat. Pettibone makes the same argument here. The component warranty says that the hydrostatic motor and pump "shall be warranted to the original owner" (emphasis added). It further states that "it shall be the option of Barko and/or Sundstrand to replace any failed units with genuine Sundstrand rebuilt units," and that "[a]ny charges for repairs to failed pumps and/or motors which are not warrantable as determined by Sundstrand will be borne by the customer" (emphasis added).
In Alabama, express warranties are governed by Ala. Code, 1975, § 7-2-313, which states:
 "(1) Express warranties by the seller are created as follows:
 "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."
Express warranties should be treated like any other type of contract and interpreted according to general contract principles. Williston on Sales, § 15-9 (4th ed. 1974). In Alabama, the crux of all express warranty claims is that the goods did not conform to the warranty. Ala. Code 1975, §7-2-313.
The component warranty here does not specifically state that it warrants against "defects" in the product: rather, it warrants the hydrostatic pumps and motors against "failure." The Court of Civil Appeals based its affirmance on the express warranty partly because it found that Miller did not provide substantial evidence of a "warrantable defect." In other words, the Court of Civil Appeals treated "warrantable defect" as if it was something that had to be found in every express warranty claim, without reference to the language of the warranty itself.
On the contrary, "[c]are must be taken to avoid elevating a defect in the goods to the status of an essential element that must be shown in order to recover for a breach of an express warranty." Ronald A. Anderson, Anderson on the UniformCommercial Code, § 2-313:217 (3d ed. 1995). If a company such as Pettibone wishes to warrant only defects in material and workmanship, then it may do so;[6] with such a warranty, the plaintiff would have to show that the product was defective in order to show that the goods did not conform to the warranty. Conversely, if a company wishes to warrant against all problems with its product, regardless of origin, then it may do that as well. See Anderson, supra, at § 2-313:205 ("A seller may make a warranty as broad as the seller requires and may go beyond the scope of those warranties that the law would imply").
In light of the broad language used in this particular component warranty, we can see no other interpretation than that it warrants against "failures" of the hydrostat. Miller met his prima facie burden of showing that the hydrostat failed on April 18, 1991, and other previous times, by presenting testimony of the operators of the feller buncher and of those who worked on the hydrostat after it had broken down. We agree that, if this warranty provided coverage for "defects in material and workmanship," then Pettibone would have had at least a plausible argument that Miller had not met his evidentiary burden; *Page 1377 
however, Miller did offer substantial evidence that the hydrostat failed on April 18. Accordingly, we hold that Miller met his evidentiary burden of proof concerning the warrantability of the failure of the hydrostat.
 B. Failure of Essential Purpose
The next question is what remedy Miller may have for a breach of the component warranty. We agree with Pettibone that, when read in its entirety, the component warranty provided for a limited remedy of repair and replacement of parts. It sets out a procedure for making claims, whereby the customer must return the components to Barko, which will then give the dealer a new component and return the old one to Sauer-Sundstrand. Because we hold that the component warranty is limited to the repair and/or replacement of parts, Miller must provide substantial evidence that the limitations do not apply to him, in order to successfully maintain an action for breach of the component warranty.
To negate the limitations of the warranty, Miller argues that the component warranty has "failed of its essential purpose," under Ala. Code 1975, § 7-2-719(2), and that he therefore should be allowed to recover damages for breach of warranty. He citesMassey-Ferguson, Inc. v. Laird, 432 So.2d 1259 (Ala. 1983), for the proposition that, by presenting evidence of the repeated failures of the hydrostat, he has presented substantial evidence that the limited warranty failed of its essential purpose.
This Court stated the general rule regarding "failure of essential purpose" of a warranty in Ag-Chem Equipment Co. v.Limestone Farmers Co-op, Inc., 567 So.2d 250, 252 (Ala. 1990):
 "In order to show that the warranty failed of its essential purpose, [the plaintiff] must show that the [warrantor] refused to repair or replace the engine in accordance with the warranty or that the [warrantor] did not repair the engine within a reasonable time."
See also Tiger Motor Co. v. McMurtry, 284 Ala. 283,224 So.2d 638 (1969). In Massey-Ferguson, 432 So.2d 1259, the Court applied this statutory doctrine to a case involving a defective combine. The warranty in Massey-Ferguson was limited to the repair or replacement of defective parts. The combine had broken down on numerous occasions, and the warrantor attempted to repair it every time under the warranty at its expense. This Court held that the plaintiff had shown that the limited warranty failed of its essential purpose:
 "Here, Massey-Ferguson and Boyd attempted to repair the combine numerous times at their expense. However, the combine was never repaired to Laird's reasonable satisfaction. In effect, Massey-Ferguson argues that it had the right to remedy defects in the combine for an unlimited period of time. To the contrary, the seller does not have an unlimited period of time to repair and/or replace parts under a warranty. . . . Given the numerous attempts at repair over the extended time period, the jury could properly conclude . . . that the combine was not repaired within a reasonable time and that the limited warranty had failed of its essential purpose. . . . This determination invokes Code 1975, § 7-2-719(2), which states: 'Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.' "
Massey-Ferguson, 432 So.2d at 1264 (citations omitted).
Similarly, in this case, we must decide whether Miller presented substantial evidence that the limited warranty on the hydrostat had failed of its essential purpose. After reviewing the record, we hold that Miller has met his burden of proof. The testimony he provided traced the history of this feller buncher. Miller himself testified as to various problems with the hydrostat over the course of the 21 months. Miller presented the testimony of Harold Allison, one of the mechanics for Kennemer Manufacturing who repeatedly serviced the feller buncher, including the hydrostat. He also presented deposition testimony of the operator of the machine, John Devaney, who testified from a first-hand point of view as to every problem that had occurred with the machine and the hydrostat. *Page 1378 
In short, the testimony presented by Miller concerning the multitude of problems with the feller buncher, and specifically with the hydrostat, established a prima facie case concerning the express warranty claim.[7] The fact that Pettibone repaired the hydrostatic system every time and "absorbed" the costs does not affect Miller's claim that the limited warranty had failed of its essential purpose. Massey-Ferguson, 432 So.2d at 1264. As this Court stated in General Motors Corp. v. Earnest,279 Ala. 299, 184 So.2d 811 (1966):
 "[A]t some point after the purchase of a new [product], the same should be put in good running condition, that is, the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. This is no more than saying that at some point in time, it must become obvious to all people that a particular [product] cannot be repaired or parts replaced so that the same is made free from defect."
279 Ala. at 302, 184 So.2d at 814 (citations omitted).
Pettibone argues that our decisions in Ag-Chem Equipment, supra, and Belcher v. Versatile Farm Equip. Co., 443 So.2d 912
(Ala. 1983), mandate a judgment in its favor.[8] Pettibone argues that those two cases stand for the proposition that an offer by a warrantor to fix the product under warranty, and/or the failure of the customer to bring the product in for repair, is always sufficient to defeat the "failure of essential purpose" claim. However, our reading of the cases shows us that neither case stands for this proposition urged by the defendant, but that in fact each of those cases supports Miller's contention that he should have been allowed to submit his express warranty claim to the jury.
The specific holding in Ag-Chem was that the warrantor had complied with the terms of its warranty by offering to rebuild the engine under warranty. The plaintiff in that case could not claim that the warranty had failed of its essential purpose, because he never gave the warrantor the chance to comply with the limited warranty. Similarly, our holding in Belcher focused on the language of the warranty itself, especially on the clause of the warranty that made the warranty void if the plaintiff altered or added equipment to the machine without authorization from the warrantor, and on the fact that the plaintiff had clearly violated this provision. The fact that the plaintiff in Belcher did not bring the tractor in for repair after the fifth breakdown was merely a fact to be considered in determining whether the warranty was breached.[9]
In both cases, our holdings focused on the fact that the plaintiff himself had breached the warranty in some way. In this case, *Page 1379 
Miller is claiming that Pettibone did not comply with its limited warranty because it did not properly fix the hydrostat within a reasonable time, thus causing the limited warranty to fail. Unlike the plaintiff in Ag-Chem, Miller did try to have his product fixed, on numerous occasions, and Pettibone had ample opportunities to repair the machine "within a reasonable time." Whether Pettibone did repair it "within a reasonable time," or could have done so had Miller submitted the hydrostat for repair, is a question of fact for the jury. Also, unlike the warranty in Belcher, this warranty contains no provision as to the conduct of the owner that could serve to put the owner in breach of the warranty.
To support his claim that the limited warranty failed of its essential purpose, Miller must prove that it would have been futile to again submit the hydrostat to Pettibone for repair; in other words, Miller must show that the warrantor failed to repair the machine within a reasonable time. SeeAg-Chem, 567 So.2d at 252. While Miller would be required to submit the machine for repair in order to comply with the limited warranty, and must prove that it would have been futile to do so again after the last failure,[10] he was not required, as a condition to recovering for breach of the express warranty, to submit the machine for repair after it would have been futile to do so.
Accordingly, we hold that the Court of Civil Appeals erred in affirming on the express warranty count, because Miller presented substantial evidence that Pettibone breached the warranty and that the limited warranty had failed of its essential purpose.
 II. Hearsay
The circuit court sustained an objection on hearsay grounds to Miller's testifying to an out-of-court statement by Mr. Joe Woods, a regional sales manager for Pettibone. Miller made an offer of proof that he would have testified that Mr. Woods told him in a telephone conversation after the April 18 breakdown that Pettibone would no longer repair the hydrostat. The admissibility of the hearsay statement turns on whether Mr. Woods was an agent of the Pettibone Corporation, with the authority to speak for it on matters concerning the warranty. If so, then the statement would be admissible as the admission of a party opponent. See Volkswagen of America, Inc. v.Harrell, 431 So.2d 156 (Ala. 1983). As proof of agency, Miller presented the circuit court with the following as an offer of proof:
 "I would like to make a showing on the record on Your Honor's ruling made after sustaining an objection to a question asked to Mr. Miller about conversations he had with Joe Woods after the machine broke down in 1991. Mr. Joe Woods is the southeastern regional sales representative or manager for Barko. He is a Barko management employee. You sustained a hearsay objection to that conversation. And our position is that Mr. Joe Woods had been involved in this matter; he had, in fact, been on the phone according to the testimony and visited the job site and discussed the problems and so forth. Mr. Woods, if we were allowed to present it, Mr. Miller would testify that Mr. Woods told him in the last conversation that they — Barko — was not going to fix the machine anymore."
However, after reviewing the record, we do not see that the circuit court ever ruled on the offer of proof. The parties argued about whether Mr. Woods was an agent with the authority to bind Pettibone, but then proceeded to argue other matters without obtaining any ruling on whether Mr. Woods was Pettibone's agent, or whether Mr. Miller would be allowed to testify as to the statement. Thus, there was no ruling upon which to predicate error.
In summary, we affirm the judgment of the Court of Civil Appeals as it relates to the claims based on revocation of acceptance, *Page 1380 
implied warranty of fitness for a particular purpose, implied warranty of merchantability, and negligence. However, we reverse the judgment as it relates to the express warranty count; in regard to that count, we remand the case to the circuit court.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, KENNEDY, COOK, BUTTS, and SEE, JJ., concur.
[1] This case was decided before the new "judgment as a matter of law" terminology was adopted in Rule 50, Ala.R.Civ.P.
[2] As far as we can tell from the record, Barko is simply an administrative division of Pettibone, and not a subsidiary; this is the reason Pettibone is bound by the warranty.
[3] For purposes of this opinion, and in accordance with the briefs of the parties, the term "hydrostat" includes the hydrostatic motor and the hydrostatic pump.
[4] The machine warranty stated the following:
"PETTIBONE will cause any part of a PETTIBONE product covered by this warranty which proves to be defective in material and workmanship within six (6) months or 1,000 hours, whichever occurs first from first day in service, provided first day service is not later than sixty (60) days from delivery to Distributor and/or original Buyer or other user, provided, however, that the terms of this warranty may be extended by Pettibone whenever equipment is purchased for stock or like purposes, to be replaced without charge with a new or repaired part, at Pettibone's election. PETTIBONE will also cause the labor to remove any such defective part and to install the new or repaired part to be provided without charge to the owner of said PETTIBONE product. The parts and labor to meet this warranty will be furnished by PETTIBONE distributor designated by PETTIBONE. . . .
"PETTIBONE'S warranty does not cover:
". . . .
 "3. Damage due to failure to maintain or use the PETTIBONE product or part according to manuals, schedules or good practice.
". . . .
 "9. Engines, transmissions and components, including tires, batteries or other parts not manufactured by PETTIBONE. The warranty of the respective manufacturers of these components shall apply to said items unless said manufacturers make no warranty with respect to said items, in which event PETTIBONE'S warranty shall apply."
(Emphasis added.)
[5] The Barko component warranty stated:
"Sundstrand 36 series pumps and VII-160 motors shall be warranted to the original owner for a period of 24 months from in-service date of the machine. During the first 6 months or 1,000 hours, Barko/Sundstrand will determine if units are warrantable. . . . After the first 6 months or 1,000 hours, component warranty will be determined by Sundstrand. . . . It shall be the option of Barko and/or Sundstrand to replace any failed units with genuine Sundstrand rebuilt units. Such units may be replaced more than once during the warranty."
[6] The machine warranty from Pettibone provides a good example of such a warranty.
[7] See Lipham v. General Motors Corp., 665 So.2d 190
(Ala. 1995) (holding that the plaintiffs had presented substantial evidence "from which a trier of fact could reasonably infer the existence of the problems complained of and the failure to remedy these problems despite [the plaintiffs'] affording the defendant several opportunities, over a four-month period, to do so through [the dealer]").
[8] In Ag-Chem, the warrantor told the plaintiff that it would rebuild the engine under warranty, but would not replace it. The plaintiff claimed that, because Ag-Chem refused to replace
the engine, the limited warranty had failed its essential purpose and therefore he could pursue his breach of warranty claim for damages. This Court reversed the judgment based on the jury verdict in favor of the plaintiff, and held that because the warranty clearly stated that Ag-Chem could repair or replace the engine, then it had either option. 567 So.2d at 252. Therefore, Ag-Chem's insistence on rebuilding the engine, rather than replacing it, was not a "refusal" to repair or replace that would cause the limited warranty to fail of its essential purpose.
In Belcher, we affirmed the judgment of the circuit court, sitting as the trier of fact, against the plaintiff on the breach of warranty count. The plaintiff, Belcher, had submitted the tractor he purchased to the warrantor for repairs four times, for a variety of problems. Finally, after the tractor had broken down a fifth time, Belcher refused to take the tractor in for repair, and continued to operate the tractor until he had rendered it inoperable. The court held that the circuit judge was not palpably wrong in deciding against the plaintiff on the breach of warranty count. 443 So.2d at 916.
[9] Also, in Belcher the circuit judge, sitting as the trier of fact, determined from the facts of that case that the warranty had not failed of its essential purpose. In this present case, because we are dealing with a directed verdict, no facts have been determined; rather, we are to take all inferences in Miller's favor.
[10] Exactly when it becomes futile to submit a machine to a warrantor for repair is a fact question for the jury. The main point of this doctrine, after all, is to prevent a warrantor from limiting its customers solely to the remedy of repair after it has become obvious to reasonable persons that the warrantor cannot or will not repair the machine in compliance with the limited warranty.