Vernell Hollings was killed when the pulpwood truck he was driving was struck by a tractor-trailer rig driven by defendant Eligha Marshall, an employee of Underwood Builders Supply Co. Marshall and Underwood appeal from a jury verdict of $100,000 against them in favor of the administrator of Hollings' estate. We affirm.
This suit for wrongful death was originally instituted in March, 1975, by Lucrether Mae Hollings, the purported common-law wife of Vernell Hollings, as administratrix of his estate, and her two children, Edward and Melvin. It has never been seriously disputed that Hollings was the father of the two children and that they were dependent upon him for their support at the time of his death. Several months after suit was filed the Alabama Forest Products Industry Workmen's Compensation Self-Insurer's Fund was allowed to intervene as it had been paying compensation benefits to plaintiffs since the death of Hollings. In September, 1975, Patricia Hollings, Comer Joyce Hollings, and Lydia Elaine Hollings filed a motion either to intervene or to be substituted as party-plaintiffs. This motion alleged that Patricia had married Hollings in 1950 and had never been divorced from him. The two children of this marriage, Comer and Lydia, were not dependent upon Hollings at the time of his death. In December, 1975, Patricia and her children were allowed to intervene as party-plaintiffs so that a struggle to gain control of the lawsuit ensued between the common-life wife (Lucrether) and her dependent children and the lawful wife (Patricia) and her nondependent children. The morning of the trial the Self-Insurer's Fund was dismissed from the case with prejudice as against all parties on its own motion, thereby removing any issue of workmen's compensation from the case as tried. In addition, an amended complaint was filed changing the style of the case and adding a charge of wantonness so that the trial commenced in the name of Ron E. Kopesky as administrator and Edward Lernell Hollings and Melvin Shelton Hollings as dependent minor children. At the close of all the evidence defendants filed a motion for directed verdict which was granted as to the two dependent minor children but denied as to the administrator, Kopesky.
The fatal accident which prompted this litigation occurred on the afternoon of April 23, 1973, on Interstate 10 east of Mobile near the Loxley cut-off. That morning at 5:00 AM Marshall left Underwood Builders Supply in Mobile in a '61 tractor-trailer rig owned by Underwood to deliver a load of stone to Fort Walton Beach. On his return trip at approximately 3:40 in the afternoon he collided with the pulpwood truck driven by Hollings. Conflicting evidence was presented at trial on exactly how and why the accident occurred. Plaintiffs basically maintained that Marshall simply ran Hollings down, while defendants argued that Hollings pulled out in front of Marshall. The collision caused Marshall's rig to veer off into the median. Marshall was injured and taken to a nearby hospital. Hollings was not so lucky. The force of the impact caused the pulpwood *Page 78 
truck to tip over so that Hollings was crushed to death by either the truck itself or its load of logs. Roy Hay, an eyewitness who had been behind Marshall, stopped to render assistance. Along with several other travelers Hay moved trash out of the left-hand lane so traffic could pass.
About 35 minutes after the accident occurred State Trooper Aubrey Little arrived on the scene and began his investigation. He indicated on his accident report that Marshall had struck Hollings from behind in the right-hand lane. Little's report further stated that Marshall had apparently fallen asleep at the wheel. When testifying at the trial four years later, Little could not remember what prompted him to draw these conclusions; in fact, Little obviously could not remember much about the fatal accident at all, even though he was allowed to refresh his memory by referring to the accident report.
Defendants strenuously argued at a pre-trial conference that Trooper Little's conclusions were suspect because the accident scene had been changed by Hay and others before Little's arrival. In addition defendants felt that Little's inability to remember the basis for his conclusions would prevent the admission of certain statements on the report, notably the statement that Marshall had fallen asleep at the wheel. Consequently, defendants were given permission by the trial court to conduct a voir dire examination of Little before he testified in front of the jury. Plaintiffs, however, began by calling Marshall as a hostile witness and during his examination asked Marshall if he had fallen asleep at the wheel. Defendants' resultant motion for mistrial was denied. Trooper Little was then called as a witness. After the voir dire examination the trial court ruled that no questions were to be asked about the sleep comment on the accident report. Throughout his testimony the accident report was relied on heavily by Little to refresh his recollection and was referred to by counsel for both parties. The trial was a heated one, marked by frequent outbursts and bickering among counsel, and culminated in closing statements interrupted five separate times by objections from both sides. The jury received the case on theories of negligence, wantonness, and contributory negligence and returned a general verdict for the one remaining plaintiff, the administrator. Other details of the trial will be set out below as necessary.
Defendants assert on appeal that there was insufficient evidence to justify submitting the wantonness count to the jury. If that contention is correct, the case must be reversed and remanded. After examining the entire record, we do not, however, agree with defendants' analysis of the evidence. Alabama only requires a scintilla of evidence to allow a count to go to the jury. The rule was stated in Kilcrease v. Harris,288 Ala. 245, 259 So.2d 797 (1972), where this Court observed:
 "In civil cases, a question must go to the jury, if the evidence, or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint."
In Kilcrease this Court also gave as thorough a definition of wantonness as is possible.
 "`Wantonness' is the conscious doing of some act or the omission of some duty under the knowledge of the existing conditions, and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Wantonness may arise from knowledge that persons, though not seen, are likely to be in a position of danger, and [where] conscious disregard of known conditions of danger and . . . violation of law brings on the disaster. Wantonness may arise after discovery of actual peril, by conscious failure to use preventive means at hand. Knowledge need not be shown by direct proof, but may be shown by adducing facts from which knowledge is a legitimate inference." (Citations omitted.)
In applying this definition of wantonness we believe that the necessary scintilla of *Page 79 
evidence was presented. Of course, the evidence was in conflict, but from the conflicting evidence a jury could have found that prior to impact Hollings' pulpwood truck was moving down the highway, partially in the right lane and partially on the shoulder, at a speed of 45 mph, that Marshall spotted Hollings from a distance but made no effort to brake and instead simply took his foot off the gas to slow down, that Marshall began to change lanes but in the process struck the pulpwood truck. In other words a jury could have found that Marshall, aware of a perilous situation, took only limited means to prevent the accident and in effect bore down on Hollings' pulpwood truck at a speed of 60 mph without braking. Under the scintilla rule the trial judge did not err in submitting the wanton count to the jury.
Defendants next argue that counsel for plaintiff intentionally presented prejudicial material to the jury through the questioning of witnesses, thereby necessitating a new trial. This contention was presented to the trial court in a motion for mistrial and later a motion for a new trial. Both motions were denied. Two incidents involving statements on the accident report are particularly complained of. The first occurred while plaintiff's counsel was questioning the defendant Marshall on direct as a hostile witness:
MR. BRISKMAN:
 "All right. Mr. Marshall, when you — when you spoke to the Officer, did you — did you tell him anything about you being drowsy or dozing?
"A. No, I did not.
 "Q. Did you tell him anything that you dozed off at the wheel before the accident?
"A. No.
 "Q. Have you had an opportunity to see the police report?
"A. No, I haven't.
"Q. Had — have you been told that the . . .
"MR. WALDROP: Wait a minute . . .
"MR. REEVES: Wait a minute . . .
 "MR. WALDROP: We would object to that, Your Honor.
 "THE COURT: I don't think he has finished his question.
"MR. BRISKMAN: I will withdraw it, Judge.
"(A brief pause.)
 "A. Mr. Marshall, do you know that on the report of the Police Officer, there was a statement as to what the cause of the accident was, do you know that?
"A. No, I don't.
 "Q. Do you know that there is a — there is some remarks on there concerning you dozing at the wheel?
 "MR. WALDROP: Your Honor, we would object to that.
"THE COURT: I sustain."
At this point defendants moved for a mistrial. After argument by counsel the motion was denied and the jury brought back in. The trial court then gave the following instructions to the jury:
 "THE COURT: Ladies and gentlemen of the jury, the last question propounded by the attorney for the Plaintiffs dealt with an accident report. There was no answer to the question and there was nothing in evidence for you to consider. The Court would instruct you that this accident report is not in evidence and is not admissible and should not be considered by you. There is nothing before you in evidence dealing with the accident report. You should not take any question propounded by the attorney for the Plaintiffs as suggesting anything that will be in such report."
Counsel then pursued another subject and the question of drowsiness did not come up again in the presence of the jury.
The second incident occurred when plaintiff's counsel was questioning Trooper Little. The accident report was mentioned repeated times as Little used it to refresh his recollection while testifying, but in this *Page 80 
regard references to the report were made by counsel for both plaintiff and defendants, so defendants can hardly complain about these separate references now. Defendants, however, particularly object to the following questions:
MR. RICHARDSON:
 "Officer, I note on these reports here you have these different marks here where you fill in and it's a form report. Where you have contributing circumstances under Vernell Hollings there, did you —
"MR. WALDROP: Your Honor, —
"MR. RICHARDSON: Well, may I ask the question?
"MR. WALDROP: Go ahead.
 "Q. All right, under the block of contributing circumstances here, I turn here to the back pages, I see it says no improper driving. Is that what is your determination as to the driving conduct of the pulpwood driver on that occasion?
 "MR. WALDROP: Your Honor, we would object to that.
"THE COURT: Sustained."
Again, upon the trial court's ruling counsel dropped this line of questioning and did not return to it.
In Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225,128 So. 389 (1930), this Court stated:
 "It is the generally accepted rule that it will constitute grounds for a new trial if counsel, in disregard of the court's ruling that a certain line of evidence is inadmissible, persists in attempting to get such evidence before the jury to the prejudice of the unsuccessful party. . . .
 "`The misconduct of counsel complained of . . . was the repeated asking of incompetent questions over the objection of counsel for defendant, and in the face of the rulings of the court that such questions were incompetent . . . Of course a large discretion is allowed an attorney in presenting his case, and so long as it does not appear that he is knowingly and intentionally violating the rules of practice in the introduction of evidence, or otherwise, the fact that he does so will furnish no grounds of complaint to opposing counsel, where the error is corrected by the court; but . . where counsel persistently pursues a line of interrogation which the court rules to be wrong, and which one reasonably well acquainted with the rules governing the admission of evidence must know to be improper, the conclusion is irresistible that it is done for the purpose of influencing and prejudicing the minds of the jury in arriving at a verdict. No court should countenance such conduct. * *
 "`Where an incompetent question is asked, opposing counsel must either permit it to be answered or enter his objection; and, although the trial court refuses to permit the question to be answered, the very fact that the same question in a different form is repeatedly asked, and a vigorous objection interposed to its answer, emphasizes its importance in the minds of the jury, and necessarily prejudices the case, and for this reason, if for no other, where this practice is pursued to the extent indicated in the record in this case, the judgment should be reversed.'"
The core of this rule is persistence in the face of the trial court's ruling that a particular line of questioning is improper. This principle is illustrated by Gwin v. Church,272 Ala. 674, 133 So.2d 880 (1961), where this Court in applyingBlackwell noted eight separate instances in which improper references to insurance were made in front of the jury. In the instant case it was known from the pre-trial conference that the sleep statement would be challenged, but no definitive ruling had been made by the trial court at the time the matter was raised. Furthermore, only two incidences which could seriously be complained of occurred. Curative instructions were given by the trial court and the matter was not broached again by counsel in front of the jury. Under these circumstances the following remarks from Kilcrease are applicable: *Page 81 
 "It has been said that each case of this character must be decided upon its own merits and that there is no horizontal rule by which these qualities can be ascertained in all cases. Much depends on the issues, the parties, and the general atmosphere of the particular case. The final test is: `Can the prejudicial tendency or effect of the improper statement be counteracted by an appropriate instruction from the trial judge, or is it probably beyond the reach of such remedial action?' Since the trial judge was present, saw and heard what took place, assessed the tone of the statement, and observed the reaction of the jury and that of others about him to the remark of counsel, as well as the follow-up effect of his own rulings and instruction to the jury, much discretion is to be accorded the trial court in such a situation. Unless the trial court has abused its discretion, we will not reverse the case on the stated ground when presented to us. In order to cure any harm caused by the statement, the court promptly and affirmatively sustained the appellants' objection to the remark, instructed the jury to disregard the statement, and directed counsel not to refer to it. In this action the court acted correctly." (Citations omitted.)
Here the questions were not answered and were followed by curative instructions upon request. We note also that plaintiff's counsel were not the only ones who were at times overzealous in presenting their case, for the trial court sustained two separate objections to defendants' closing statements. After a thorough review of the record we do not find that the trial court abused its discretion in denying defendants' motion for mistrial or motion for new trial. The trial judge was there. He was in a much better position than this Court to judge the effect of these questions on the trial as a whole. Consequently, we do not feel it is appropriate in this instance to disturb his ruling on appeal.
In addition defendants argue that Trooper Little should not have been allowed to give his opinion on point of impact. We have discussed this issue just recently in Sharp v.Argo-Collier Truck Lines, 12 ABR 809 (Mar. 3, 1978), and Dyerv. Traegar, 12 ABR 814 (Mar. 3, 1978). There we observed that whether or not a particular witness will be allowed to testify as an expert is largely discretionary with the trial court. The trial court's decision will be reversed on appeal only for palpable abuse. Once qualified as an expert the witness who will testify as to point of impact must detail the facts upon which his conclusion is based. Here, in a torturous series of questions and objections Little testified that he found some debris in the right lane, although he could not recall the nature of the debris. He also testified that he traced the paths of the trucks as they veered off the interstate in opposite directions. The eyewitness Hay testified that there was debris all over the road and that he moved "trash" from the left lane to allow traffic to pass. Hay did not, obviously, testify that he swept the street. Pictures showed logs scattered over the area. We think that a jury could infer from this information that while large obstructions — "trash" in Hay's words — had been removed, enough debris remained to allow Trooper Little to determine the point of impact. As noted in Dyer, the alleged paucity of facts upon which the opinion was based goes to the weight, rather than the admissibility, of the evidence. We find no error in the trial court's ruling.
As a final ground for reversal defendants assert that the proper plaintiffs were the dependent children and not the administrator of the estate since this litigation at one time came under Tit. 26, § 312, Code of Ala. 1940 (Recomp. 1958). The morning of trial the Alabama Forest Products Industry Workmen's Compensation Self-Insurer's Fund, which had been paying benefits to the dependent illegitimate children was dismissed from the case with prejudice against all parties. Thus all issues of workmen's compensation were removed from the suit and it went to trial purely and simply as a wrongful death action. Under Tit. 7, § 123, Code of Ala. 1940 (Recomp. 1958), the proper party is, of course, the *Page 82 
personal representative, here, the administrator Kopesky. Proper parties are not determined by what posture the case may have had at one time, but by the posture of the case as finally tried.
Of course, when the workmen's compensation claims were dropped from the case the morning of trial the testimony of Melvin Hollings, the illegitimate dependent child, became irrelevant. No objections, however, were posed to his testimony, nor was this issue raised by any motion to the trial court. In fact, plaintiff's counsel offered to stipulate to dependency, thereby avoiding this child's testimony in front of the jury, but defendants apparently declined to do so. Consequently, defendants cannot now complain that they were prejudiced when the child was allowed, improperly, to testify in this wrongful death action.
AFFIRMED.
TORBERT, C.J., and BLOODWORTH, ALMON and EMBRY, JJ., concur.