774 So.2d 505 (2000)
SOUTHERN ENERGY HOMES, INC.
v.
Robert B. WASHINGTON.
1971628.
Supreme Court of Alabama.
February 4, 2000.
Rehearing Denied May 26, 2000.
*508 John Martin Galese, Jeffrey L. Ingram, and David A. Norris of John Martin Galese, P.A., Birmingham, for appellant.
William L. Utsey and J. Jefferson Utsey of Utsey, Christopher, Newton & Utsey, Butler; and Joseph C. McCorquodale III and Jacqualyn S. Bradley of McCorquodale *509 & McCorquodale, Jackson, for appellee.
PER CURIAM.
Robert B. Washington sued Southern Energy Homes, Inc. ("Southern"), seeking damages, including mental-anguish damages, for, among other things, breach of express and implied warranties in connection with his purchase of a custom-built mobile home from Southern. A jury returned a verdict in favor of Washington and awarded him $375,000 in damages, and the trial court entered a judgment accordingly. While Southern ascribes error to a number of the rulings by the trial court, and we will address each argument asserted by Southern, we affirm.

I.
In June 1993, Washington purchased a custom-built mobile home from Southern for $19,320. The mobile home came with a one-year warranty that provided in pertinent part:
"Southern Energy Homes, Inc. (the `manufacturer') warrants the Original Retail Purchaser(s) (the `owner') of any new mobile home manufactured by Southern Energy Homes, Inc. (the `home') that for a period of twelve (12) full months (the `warranty period') from the date of initial delivery of the home to the owner, the home will be free from any substantial defects in material or workmanship, assuming reasonable maintenance and servicing of the home by the owner as described in the Owner's manual.
"Subject to the other provisions of this warranty, the manufacturer will, at its option, repair any home or any part thereof `covered by this warranty,' which proves to be defective within the warranty period, as soon as reasonably practicable at the site at which the home is located and at no expense to the owner. The warranty specifically covers the home structure itself and all appurtenances built by the manufacturer. However, this warranty does not include any furniture, bedding, ties, carpets or draperies, which have not been built by the manufacturer....
"This warranty expressly excludes any defects, malfunctions or failures of any warranted part of the home resulting from:
". . . .
"(c) Misuse, neglect or failure to perform reasonable maintenance and servicing as described in the Owner's manual.
"(The manufacturer will have no obligation to repair roof leaks unless the roof of the home has been coated or painted as provided for on page 4 of the homeowner's manual);
". . . .
"If the owner believes that the home contains a defect covered by this warranty,... the owner should notify the service manager at the manufacturer's plant at the address shown below, giving the service manager complete information about the problem.... In the event the owner has an emergency problem which might affect the safety of the home or the ability of the owner to reside therein, the owner should immediately notify [Southern] by telephone at (XXX)XXX-XXXX. ...
"THIS WARRANTY IS GIVEN SOLELY ON BEHALF OF SOUTHERN ENERGY HOMES, INC., AND IS EXPRESSLY IN LIEU OF AND EXCLUDES AND SUPERSEDES ANY OTHER EXPRESS OR IMPLIED WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE (UNLESS A DISCLAIMER OF SUCH IMPLIED WARRANTIES IS PROHIBITED BY APPLICABLE STATE LAWS IN WHICH EVENT SUCH IMPLIED WARRANTIES SHALL BE LIMITED IN DURATION TO THE DURATION OF THIS ONE (1) YEAR WARRANTY). THE LIABILITY OF SOUTHERN ENERGY HOMES, INC., SHALL BE LIMITED TO THE EXPRESS WARRANTY AS STATED *510 HEREIN AND THERE SHALL BE NO LIABILITY ON THE PART OF SOUTHERN ENERGY HOMES, INC., FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES."
(Telephone number omitted.) (Capitalization and italics in original.)
Washington claims that the mobile home arrived with several deficiencies, including missing siding, damaged window trim, missing molding, loose carpet, loose and/or malfunctioning bathroom fixtures, and loose and leaking entry doors. Washington also claims the mobile home had a leaky roof that caused additional damage, including water damage to the carpets and cracks in the living-room ceiling. Washington and his wife, Brenda Bettis, called Jack Lee Mobile Homes ("Jack Lee"), the dealership from which the mobile home was purchased, to complain about the problems. According to Washington, Jack Lee said it would notify Southern about the problems. Jack Lee also gave Bettis Southern's telephone number so she could contact Southern directly. Washington claims that he and his wife telephoned Southern at that number several times complaining about the condition of the home. Bettis also claimed to have telephoned Merchants Bank, through which the mobile home was financed, to find out whom she needed to contact to repair the home. According to Washington, several attempts were made to repair the roof one by him, one by his wife's cousin, and one by a Jack Lee employee. Washington, however, never coated the roof with a sealant.
In June 1995, Washington sued Jack Lee, Southern, and Merchants Bank, seeking compensatory damages, including mental-anguish damages, punitive damages, and an attorney fee, and alleging claims of fraud, fraudulent suppression, breach of implied warranty, and breach of express warranty. The trial court entered a summary judgment in favor of Southern with respect to the fraud and fraudulent-suppression claims and with respect to Washington's request for an award of an attorney fee. The trial court also entered a summary judgment in favor of Merchants Bank on all claims against it. The remaining claims went to trial. At the close of Washington's case-in-chief, the trial court entered a judgment as a matter of law in favor of Jack Lee on all claims against it. However, the trial court denied a motion by Southern for a judgment as a matter of law with respect to the remaining claims against it, that is, the claims alleging breach of implied and express warranties. Southern renewed its motion at the close of all the evidence. The trial court denied the motion and submitted to the jury Washington's breach of implied and express warranty claims. The jury returned a verdict in favor of Washington and awarded $375,000 in damages. Southern renewed its motion for a judgment as a matter of law and filed a motion for a new trial or, in the alternative, a remittitur. The trial court denied Southern's motions.

II.
Southern argues that the trial court erred in denying its motions for a judgment as a matter of law on Washington's breach of implied and express warranty claims. Specifically, Southern argues that the trial court should have entered a judgment as a matter of law in its favor because, it argues, Washington failed to give sufficient notice of the problems with his mobile home and because the trial court entered a judgment as a matter of law in favor of Jack Lee on Washington's fraud claims. Southern also argues that the trial court erred by not entering a judgment as a matter of law in its favor to the extent Washington's claims were based on roof leaks, because roof leaks were excluded from warranty protection if the homeowner did not apply sealant to the roof.
"A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could *511 differ and the moving party is entitled to a judgment as a matter of law." Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala.1997) (internal quotations and alterations omitted). In reviewing the denial of a motion for a judgment as a matter of law, this Court must view all evidence in the light most favorable to the nonmoving party. See Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988).

A.
Southern argues that the trial court should have entered a judgment as a matter of law in its favor because, it claims, Washington failed to provide sufficient notice of the problems with his mobile home. "Alabama's enacted version of the Uniform Commercial Code (U.C.C.) dealing with notice requires that where a tender has been accepted, the buyer must notify the seller of any breach within a reasonable time after he discovers, or should have discovered, the breach." Barrington Corp. v. Patrick Lumber Co., 447 So.2d 785, 788 (Ala.Civ.App.1984).[1] "A person `notifies' or `gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it." § 7-1-201(26), Ala.Code 1975. Whether Washington notified Southern of the problems with his mobile home was a disputed issue at trial. Washington presented evidence indicating that he telephoned Southern about the problems, that his wife telephoned Southern about the problems, and that Jack Lee also telephoned Southern about the problems. Whether this notice was sufficient was a question of fact, and there was sufficient evidence to support the jury's finding that the notice was sufficient. See Barrington, 447 So.2d at 788.
Southern argues that the terms of its warranty required that Washington give written notice of all nonemergency problems, and that Washington give telephone notice, at a particular telephone number, of all problems that might affect the safety or habitability of the mobile home. We disagree. "Express warranties [are] treated like any other type of contract and interpreted according to general contract principles." See Ex parte Miller, 693 So.2d 1372, 1376 (Ala.1997) (citing 2 Alphonse M. Squillante & John R. Fonseca, Williston on Sales, § 15-9 (4th ed.1974)). If a company wishes to require a specific mode of notice as a prerequisite to warranty coverage, it may do so. See generally Miller, 693 So.2d at 1376 (stating that a company can limit its warranty coverage); see also Rhode v. E & T Invs., Inc., 29 F.Supp.2d 1298, 1303 (M.D.Ala. 1998) (construing a warranty under which a manufacturer agreed to replace defective parts "PROVIDED THAT the Owner gives written notice of any such defect to the Manufacturer or its Dealer at their business address within one (1) year and ten (10) days"). Although the warranty at issue in this case states that the owner "should" notify Southern in writing or by calling a specific telephone number, nothing in the warranty declares that these are the only methods by which Southern may be notified of defects in the mobile home or declares that compliance with this request is a prerequisite to warranty coverage. Accordingly, Washington's failure to use these methods in notifying Southern did not entitle Southern to a judgment as a matter of law.

B.
Southern argues that the trial court should have entered a judgment as a matter of law in its favor on Washington's breach of warranty claims when it entered a judgment as a matter of law in favor of Jack Lee on Washington's fraud claims.[2] *512 Specifically, Southern argues that by entering a judgment as a matter of law on the fraud claims, the trial court had judicially determined that the mobile home had been delivered free of defects. We disagree.
Except as to fraud claims based on misrepresentations "made by mistake and innocently" (see § 6-5-101, Ala.Code 1975), in order to succeed on a fraud claim the plaintiff must affirmatively establish: (1) a false representation concerning an existing material fact; (2) the defendant's knowledge of the statement's falsity, the defendant's recklessness with regard to the statement's truth or falsity, or the defendant's false statement representing knowledge of the truth of the representation; (3) the plaintiff's reliance on the representation; and (4) damage as a proximate result of the reliance. See Ex parte Government Employees Ins. Co., 729 So.2d 299, 304 (Ala.1999). Although the trial court offered no reason for entering a judgment as a matter of law in favor of Jack Lee on Washington's fraud claims, Southern argues that the trial court's ruling was a judicial determination that the mobile home was free of defects. A review of the record, however, indicates that Washington presented no evidence that Jack Lee made the alleged misrepresentation that the mobile home "would be free of defects"with knowledge that the statement was false or with reckless disregard as to whether the statement was true or false, and Washington did not allege innocent misrepresentation. Moreover, the record indicates that Jack Lee actually conceded that defects were possible, telling Washington that Southern provided a one-year warranty on the mobile home "in case there were defects." Thus, Washington failed to present substantial evidence in support of his fraud claims. The fact that Washington failed to prove one or more of the elements of his fraud claims does not conclusively establish that the mobile home was free of defects. In fact, in light of the substantial evidence to the contrary, a judicial determination that the mobile home was free of defects would have been improper. See Smith v. Vice, 641 So.2d 785, 786 (Ala.1994) ("The ultimate question is whether the nonmovant has presented substantial evidence to allow submission of the case or issue to the jury for a factual resolution."). Accordingly, the trial court's entering a judgment as a matter of law in favor of Jack Lee on Washington's fraud claims did not require the trial court to enter a judgment as a matter of law in favor of Southern on Washington's breach of warranty claims.

C.
Southern argues that the trial court should have entered a judgment as a matter of law in its favor to the extent Washington's claims were based on roof leaks. Specifically, Southern argues that roof leaks were expressly excluded from warranty protection because Washington did not apply sealant to the roof. We disagree.
Express warranties are governed by § 7-2-313, Ala.Code 1975, which states:
"(1) Express warranties by the seller are created as follows:
"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."
Express warranties are treated like any other type of contract and are interpreted according to general contract principles. See Ex parte Miller, 693 So.2d 1372, 1376 (Ala.1997) (citing 2 Alphonse M. Squillante & John R. Fonseca, Williston on Sales, § 15-9 (4th ed.1974)). Limitations on express warranties are governed by § 7-2-316, *513 Ala.Code 1975. Section 7-2-316 provides in pertinent part:
"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (Section 7-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable."
Section 7-2-316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty." § 7-2-316, Ala.Code 1975, Official Comment, ¶ 1. Moreover, any ambiguity is construed against the drafter, as a general principle of contract construction. See generally Strickland v. General Motors Acceptance Corp., 578 So.2d 1275, 1277 (Ala.1991) (holding that ambiguous contract provisions must be construed against the drafter). "This rule of construction is not harsh, `[s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning than one with whom he is dealing.'" Strickland, 578 So.2d at 1277 (quoting 4 Walter H.E. Jaeger, Williston on Contracts, § 621 (3d ed.1961)).
Southern's express warranty provides that the mobile home would be free from defects for one year, "assuming reasonable maintenance and servicing of the home by the owner as described in the Owner's Manual." The warranty excludes any defects resulting from, among other things, the homeowner's "failure to perform reasonable maintenance and servicing as described in the Owner's Manual." The warranty also states that Southern would "have no obligation to repair roof leaks unless the roof of the home has been coated or painted as provided for on page 4 of the homeowner's manual." Notwithstanding the warranty's directive, nothing on page 4 of the homeowner's manual provides any discussion of painting or coating the roof of the mobile home. Directions for roof coating do appear on page 15 of the homeowner's manual, but nothing in these directions "provides" that Washington should have coated or painted the roof prior to the expiration of the warranty period. The directions on page 15 state that the homeowner should "coat" the roof with a preservative or paint "after the first 12 months" and every other year thereafter. (Emphasis added.) The directions further provide that the roof should be inspected twice a year and "recoat[ed]" as necessary. Because the maintenance directions do not indicate that the homeowner should coat or paint the roof during the warranty period, the roof leaks were not excluded from the warranty for "failure to perform reasonable maintenance and servicing as described in the [homeo]wner's [m]anual." Although Southern's warranty could be read to exclude all warranty coverage of roof leaks until the roof is coated or painted "after the first 12 months," at which time there is no warranty coverage at all, such a limitation is inoperative because it is inconsistent with Southern's warranty that the mobile home, "assuming reasonable maintenance and servicing," will be free of substantial defects for one year from the date of the initial delivery of the home to the owner. See § 7-2-316(1), Ala.Code 1975 (providing that limitations on express warranties are inoperative to the extent they cannot be reasonably read as being consistent with the warranty). Thus, Washington's failure to paint or coat the roof during the warranty period did not require the trial court to enter a judgment as a matter of law in favor of Southern on Washington's breach of warranty claims.

III.
Southern argues that the trial court erred in denying its motion for a new trial on Washington's breach of implied and express warranty claims. Specifically, Southern argues that the trial court should *514 have granted it a new trial (1) because of misconduct by Washington and Jack Lee during discovery, (2) because Washington made several references to excluded evidence during the trial, and (3) because Washington made several improper arguments to the jury during closing arguments.

A.
Southern argues that the trial court erred by not granting it a mistrial when Washington attempted to introduce into evidence a telephone bill that he had not disclosed during discovery. We disagree. A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. See Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991). A mistrial, however, should be granted only when the movant demonstrates a "high degree of `manifest necessity.'" See Levett, 593 So.2d at 135 (quoting Garnett v. State, 555 So.2d 1153, 1155 (Ala.Crim.App. 1989)). A trial court should not grant a motion for a mistrial when it can otherwise remove the prejudicial qualities of an improper comment. See id. at 135. The trial court is in the best position to observe what happened, to determine its effect on the jury, and to determine whether a mistrial should be granted. See Marshall v. Kopesky, 361 So.2d 76, 81 (Ala.1978). Accordingly, the decision whether to grant or to deny a motion for a mistrial is within the sound discretion of the trial court, and the trial court's ruling on such a motion will not be reversed absent an abuse of that discretion. See Marshall, 361 So.2d at 81.
During Washington's presentation of his case, his wife testified that she had telephoned Southern and that Southern had promised to send someone out to check on the mobile home. The following exchange then took place:
"Q: First, let me ask you if you recognize Plaintiff's Exhibit Twenty?
"A: Yes.
"Q: What is it?
"A: My telephone bill.
"Q: That's your telephone bill?
"A: Yes."
Washington then offered the telephone bill into evidence. Southern objected, and its objection was followed by a lengthy debate at the bench about whether the bill had been properly disclosed during discovery. The trial court ultimately concluded that the bill had not been disclosed and, therefore, excluded it from evidence.
Southern moved for a mistrial, arguing that it was prejudiced by the mere presentation of the telephone bill and the bench discussion that led to its exclusion. However, "proposed exhibits are commonly displayed within view of the jury in the process of being offered into evidence. The mere fact that such an exhibit is not admitted into evidence after being seen by the jury gives no ground for mistrial." Kemp v. State, 516 So.2d 848, 850 (Ala. Crim.App.1987) (holding that the offering of a knife into evidence did not require a mistrial when the trial court excluded the knife because it had been concealed from the defense in violation of a discovery order). Rather, this Court must consider whether the prejudicial tendency or effect of the improper issue could have been counteracted by an appropriate instruction from the trial court, or whether it was beyond the reach of such remedial action. See Donald v. Matheny, 276 Ala. 52, 57, 158 So.2d 909, 913 (1963). In light of the fact that the trial court excluded the telephone bill from evidence, the witness's mere identification of the exhibit, without any discussion of the contents of the telephone bill, did not substantially prejudice Southern.[3] What little prejudice Southern *515 may have suffered could easily have been cured by an instruction explaining that it was an attorney's obligation to object to inadmissible evidence, and by directing the jury to ignore any reference to the telephone bill. Southern never asked for such an instruction, preferring instead to seek only the extreme remedy of a mistrial. This Court will not reverse for the trial court's failing to give an instruction that was not requested. See C.C. Hooper Café Co. v. Henderson, 223 Ala. 579, 582, 137 So. 419, 422 (1931). Accordingly, the trial court did not err by failing to declare a mistrial when Washington attempted to introduce the telephone bill.

B.
Southern argues that the trial court committed reversible error by permitting Washington to use a telephone bill that had been excluded from evidence to refresh his wife's testimony about telephone calls she claimed to have made to Southern, and by permitting counsel for Washington to list the dates of the alleged telephone calls on a placard for the jury to see. We disagree. "It is true that the court has an obligation to prevent witnesses from `putting into the record the contents of an otherwise inadmissible writing under the guise of refreshing recollection.'" United States v. Scott, 701 F.2d 1340, 1346 (11th Cir.1983) (quoting Thompson v. United States, 342 F.2d 137, 140 (1965)). However, as long as "there is careful supervision by the [trial] court, the testimony elicited through refreshing recollection may be proper, even though the document used to refresh the witness['s] memory [has been excluded from evidence]." Scott, 701 F.2d at 1346. "[T]he evidence that [comes] in [is] not the [excluded] document, but rather, the recollection of the witness[]." Id. Moreover, this Court has consistently upheld the use of visual aids to illustrate testimony. See Spence v. Southern Pine Elec. Coop., 643 So.2d 970, 972 (Ala.1994). Accordingly, the trial court did not err by permitting Washington to use the excluded telephone bill to refresh his wife's recollection or by permitting Washington to use the placard to illustrate the testimony.
Southern also argues that the trial court committed reversible error by permitting the jury to use a transcribed copy of the information from the placard to aid it in its deliberations. We disagree. A trial court's decision to allow demonstrative evidence to be taken into the jury room will not be reversed absent an abuse of discretion. See Meadows v. Coca-Cola Bottling, Inc., 392 So.2d 825, 828 (Ala. 1981). Under the facts of this case, we find no abuse of discretion in allowing a handwritten document that merely lists the dates of 37 alleged telephone calls to three different parties and one telephone number to go to the jury room. See generally Prescott v. Martin, 331 So.2d 240, 246 (Ala.1976) ("[W]hen a memorandum used to refresh memory has an extensive number of items, it is proper for the memo to go to the jury, not as evidence, but as an aid to their own recollection.").

IV.
Southern argues that the trial court erred by allowing Washington to use records from the Alabama Manufactured Housing Commission to impeach Don McNutt, Southern's representative at trial. We disagree. "[T]he latitude and extent of cross-examination is a matter which of necessity rests largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse." State v. Howington, 268 Ala. 574, 575, 109 So.2d 676, 677 (1959). McNutt testified on *516 direct examination that Southern would have responded if Washington and his wife had actually made any of the telephone calls that they alleged. McNutt reaffirmed this assertion on cross-examination and testified further that Southern did not let any customer complaints go unanswered. In response, Washington questioned the representative about documents, filed with the Alabama Manufactured Housing Commission, that contained allegations from 113 other homeowners that Southern had not responded to their complaints. Southern now argues that this questioning was unduly prejudicial. All impeachment evidence is prejudicial to some extent. It is only when the probative value of the impeachment evidence is substantially outweighed by its prejudicial impact that it should be excluded. See Rule 403, Ala. R. Evid. The trial court expressly limited Washington's use of the documents to impeachment purposes and prohibited Washington from using the documents for proving the truth of the matters asserted therein. In light of the fact that McNutt attempted to bolster his testimony by asserting that Southern never lets any customer complaint go unanswered, the trial court did not abuse its discretion in determining that the prejudicial impact of the impeachment questioning did not substantially outweigh the probative value of those questions. See Howington, 268 Ala. at 575, 109 So.2d at 677.

V.
Southern argues that the trial court erred by permitting expert testimony from several witnesses. "[Q]uestions concerning the qualifications of expert witnesses are largely left to the discretion of the trial judge, and his decision will not be reversed unless he abuses his discretion." See Baker v. Merry-Go-Round Roller Rink, Inc., 537 So.2d 1, 3 (Ala.1988). Southern, citing 42 U.S.C. § 5403, argues that three witnesses were not qualified to testify about alleged defects in the mobile home because they were not qualified to apply federal statutes or regulation. The secretary of Housing and Urban Development is authorized by 42 U.S.C. § 5403 to establish federal construction and safety standards for manufactured homes. That statute also provides that whenever a federal construction or safety standard is in effect, a State cannot establish any standard applicable to the same aspect of performance unless it is identical to the federal standard. Southern, however, does not cite any federal standard that was applicable to the testimony of these witnesses, and none of these witnesses testified that Southern violated any federal standards. Moreover, nothing in Southern's warranty indicates that it warranted only minimal compliance with federal standards. Accordingly, the trial court did not abuse its discretion in determining that these witnesses did not need to be experts in federal regulations in order to testify.[4]See Baker, 537 So.2d at 3.
Southern also asserts that the trial court committed reversible error by allowing a fourth witness, Randall Chesser, to testify about deflections in the walls and certain other surfaces of the mobile home because, Southern argues, his testimony amounted to "junk science." The trial court concluded that Chesser's testimony satisfied the Frye general acceptance test. See Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), which establishes criteria for the admissibility of scientific evidence.[5] The methodology used *517 by Chesser was acquired through on-the-job training. It involves no scientific expertise, but merely a simple mathematic formula.
The Code of Federal Regulations, and specifically 24 C.F.R. § 3280.305(d), provides that the deflection of wall, roof, and ceiling surfaces "shall not exceed [L/180] (where L equals the clear span between supports or two times the length of a cantilever)." The mathematical meaning of this formula is simply that the deflection cannot exceed 1 inch in 180 inches (or 15 feet) of length. In other words, 180 divided into a length of 180 inches (or 15 feet) equals 1 inch. Thus the deflection of a span of that length, or a cantilever of half that length, could not exceed one inch. Chesser obtained knowledge of the mathematic formula through on-the-job training in the mobile-home business, including inspection and appraisal work for the Veterans Administration and the Department of Housing and Urban Development.
"Experience and practical knowledge may qualify one to make technical judgments as readily as formal education." International Telecomm. Sys. v. State, 359 So.2d 364, 368 (Ala.1978); Rule 702, Ala. R. Evid. Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702. With regard to the admissibility of expert testimony, this Court has held as follows:
"A ruling on the admissibility of expert testimony is largely within the discretion of the trial court and will not be overturned unless there has been an abuse of discretion. Bell v. Hart, 516 So.2d 562 (Ala.1987); Maslankowski v. Beam, 288 Ala. 254, 259 So.2d 804 (1972). The purpose of expert testimony is to aid the trier of fact where the subject matter is beyond the ken of the average juror. Ex parte Hill, 553 So.2d 1138 (Ala.1989); Thompson v. Jarrell, 460 So.2d 148 (Ala.1984). Thus, where a witness has sufficient `knowledge, skill, experience, or training ... that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined' it should be admitted as expert testimony. Ellingwood v. Stevens, 564 So.2d 932 (Ala. 1990), citing, C. Gamble, McElroy's Alabama Evidence, § 127.01(5) (3d ed.1977). A critical distinction in this case is that an objection to testimony of a competent expert based on the witness's lack of knowledge goes to the weight of the evidence and not its admissibility. See Ellingwood, supra; Thaggard v. Vafes, 218 Ala. 609, 119 So. 647 (1929); Pollard v. State, 549 So.2d 593 (Ala.Crim.App.1989)."
Tidwell v. Upjohn Co., 626 So.2d 1297, 1300 (Ala.1993). See also Rule 702, Ala. R. Evid.; Rule 702, Fed.R.Evid.; General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).
Chesser testified that he used a 36-inch (or 3-foot) level as his measure of length. The ratio of 1 inch of deflection per 180 inches of span can, of course, be applied to and by any length of measuring device by simply multiplying its length by the fraction 1/180 to calculate the deflection permissible for that length of span. Likewise, the *518 adaptation can be figured intuitively. The length of Chesser's level was, mathematically, exactly 1/5 of 180 inches (or 15 feet). Thus the maximum Code deflection for the length of his level would be exactly 1/5 of an inch, according to the specified ratio of 1 inch for every 180 inches. In fact, Chesser allowed Southern the benefit of the doubt by not counting any deflection smaller than ¼ of an inch per 36 inches even though the Code allowed only deflections smaller than 1/5 of an inch per 36 inches.
Chesser's testimony as delivered to the jury did not include any scientific topic that would warrant the application of the Frye standard. If Frye were to apply, the testimony would meet the standard because elementary mathematics has "gained general acceptance" in all fields of science and engineering. Chesser's qualifications as presented to the jury were sufficient to render his opinions competent. Moreover, the photographs of the walls depict that the amount of deflection exceeds Government standards to such a degree that any minor deficiency in the length of Chesser's level would be irrelevant. Southern's criticism of Chesser's methodology, under the particular evidence in this case, goes to the weight rather than the admissibility of his testimony. Finally, this aspect of Chesser's testimony constituted such a minor portion of the evidence presented to the jury, qualitatively and quantitatively, that the likelihood that it significantly affected the verdict is de minimis. Thus, the admission of Chesser's testimony about deflections in walls and other surfaces was not an abuse of discretion and does not warrant a new trial.

VI.
Southern contends that the jury's verdict in the amount of $375,000, including a substantial portion allocable to mental anguish, violates the rule of Kmart Corp. v. Kyles, 723 So.2d 572 (Ala.1998). We disagree. Washington presented evidence indicating that he experienced anger, embarrassment, and disruption of his sleep over a period of nearly five years; he presented this evidence through his own testimony, as well as that of his wife. The amount of direct evidence relating to Washington's mental anguish is readily distinguishable from the evidence relating to the mental anguish the plaintiff in Kmart, supra, claimed to have suffered. In Kmart, we held:
"We give stricter scrutiny to an award of mental anguish where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced. See Foster v. Life Ins. Co. of Georgia, 656 So.2d 333, 337 (Ala. 1994), where the Court stated:
"`We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering. Pitt v. Century II, Inc., 631 So.2d 235 (Ala. 1993). In this case, the only evidence regarding Foster's mental anguish and emotional distress is her bare assertion that the discovery of fraud affected her "a lot" and that she sued two months after the mental anguish and emotional distress began. From this limited evidence, we agree that the jury could infer that Foster suffered some measure of mental anguish and emotional distress from the realization that she had been paying over a fifth of her monthly income to an insurance company for a worthless policy; however, we hold that, even when viewed in a light most favorable to her, Foster's scant testimony of mental anguish and emotional distress, without more, does not support an award exceeding $120,000 for each of the two months before she sued. We conclude that the $250,000 compensatory *519 damages award was excessive by $200,000.'
"Unlike the plaintiff in the instant case, the plaintiff in Foster at least testified to the issue of mental anguish by saying that the discovery of the fraud affected her `a lot.' See, also, Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1033 (Ala. 1993), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994), where the Court reduced a mental anguish verdict from $750,000 to $1 in a setting where the victim of the mental anguish did not testify.
"The plaintiff here did not testify about her mental anguish in this trial."
723 So.2d at 578-79.
Washington testified that he felt bad and embarrassed when friends came to see his home. He testified that the night before trial, he had to place garbage cans out to catch water leaking from the roof, and that he had previously done so on many occasions. He testified that he was embarrassed and that the purchase of his home had been a "nightmare" to him. Furthermore, his wife testified that when it rained Washington became angry and that, as a result, they did not get along very well. She said that he would rather stay home than work to earn money to make his mortgage payment each month. The record also shows that Washington never missed a payment and that he dealt with these feelings for approximately five years. Evidence indicating that Washington experienced such feelings over such an extended period supports the jury's finding of mental anguish under the standard established in Kmart, supra.

VII.
Finally, Southern argues that it is entitled to a new trial because, it says, during closing argument Washington's counsel tried to convert the claim for compensatory damages into a claim for punitive damages. While we have authority under Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999), to order a remittitur based upon improper appeals to bias, Southern's objections to Washington's attempt to convert the claim for compensatory damages into a claim for punitive damages were met with effective corrective instructions by the trial court. In Lance, the trial court failed to take remedial measures when the plaintiff made improper and prejudicial remarks during closing arguments. To the contrary, in this case the trial court gave the jury proper corrective instructions upon Southern's objections:
"Mr. Galese: Judge, I object again on behalf of Southern. The compensatory damages to which he may be entitled have nothing to do with the number of dealers Southern Energy has. That is not related one to the other. It's an improper argument and prejudicial.
"The Court: All right.
"Mr. Galese: This is not a send the message case. This is a case about damages this man sustained for this warranty.
"The Court: Ladies and gentlemen, I will instruct you as to the law of damages in this case when I give you my charge in this case. This is a case concerning the issue of compensatory damages, and I will define that to you during the Court's charge in this case. We're not dealing with the issue of punitive damages in this case, it's not an issue, the possibility of punishing anybody for any alleged wrongdoing.

". . . .
"Mr. McCorquodale: Mental anguish is an element of damages in this case. You have the opportunity here today, you have the opportunity here today in this case, in this case, in this case alone, to send a message to those defendants
"Mr. Galese: Judge, that's highly inflammatory, highly inappropriate and prejudicial.
"The Court: Ladies and gentlemen, again in this case we are dealing with this one case only here in this case. Ladies and gentlemen, this is not concerning *520 any other alleged problems of any other mobile home. The Court will instruct you as to what the damages are and as to what mental anguish and suffering is in this case. Those will be your instruction as to what you should consider in your award of damages, if you feel the Plaintiff is entitled to recover in this case. Again, this is not a matter of punitive damages and not an issue in this case as to the possibility of punishing somebody for an alleged wrong."
(Emphasis added.)
We find no error to reverse.

VIII.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
MADDOX, COOK, LYONS, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
HOUSTON, J., concurs in part and dissents in part.
SEE, J., dissents.
HOUSTON, Justice (concurring in part and dissenting in part).
I dissent from that portion of the opinion affirming the trial court's order denying a remittitur. I would reduce the judgment to $200,000 because of counsel's improper argument.
Otherwise, I concur.
SEE, Justice (dissenting).
I disagree only with that part of the majority opinion holding that the trial court properly permitted Randall Chesser to testify that deflections in the walls and certain other surfaces of the mobile home violated 24 C.F.R. § 3280.305(d). Because I believe the trial court erred in permitting Chesser to so testify, and because I do not believe that error was harmless, I dissent.
Chesser testified that the walls, the roof, and the ceiling surfaces of the mobile home did not comply with 24 C.F.R. § 3280.305(d) because, he said, those areas exceeded the maximum degree of deflection, or deviation from a flat surface, allowed under the regulation. The regulation provides that deflection "shall not exceed [L/180] (where L equals the clear span between supports or two times the length of a cantilever)." Chesser testified that in his calculations of the maximum deflection allowed under the statute, he substituted the length of his level36 inchesfor "the clear span between supports." Nothing in the record indicates that "the clear span between supports" in this case was 36 inches, and nothing in the regulation purports to change the maximum amount of deflection allowed in a wall merely because an inspector measures the deflection in that wall with a device that is arbitrarily smaller or larger than "the clear span between supports." Chesser did not establish that this alternative method of calculation could accurately determine whether the deflection he measured exceeded the maximum deflection allowable for the entire span of wall. Chesser testified only that he developed his methodology by talking to others and reading various depositions. This is not evidence that Chesser's methodology had "gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923). Accordingly, the trial court erred by allowing Chesser to testify that the mobile home did not comply with 24 C.F.R. § 3280.305(d).
The majority justifies Chesser's testimony by stating that the formula provided by 24 C.F.R. § 3280.305(d) is merely a ratio that can be used to measure deflection in any arbitrarily selected portion of a wall. Under the majority's analysis, an expert witness may now find the maximum point of deflection in any surface covered under the regulation and then measure that deflection with a small enough measuring device to ensure that he can testify that the regulation has been violated. However, *521 § 3280.305(d) provides a formula for the calculation of the maximum deflection allowed for the entire wall. It does not by its terms provide a method by which to determine the maximum deflection allowed for any isolated or arbitrarily selected portion of the wall. Although the plain language of § 3280.305(d) provides that surfaces covered under the regulation may contain some deflection, and that greater deflection is permitted as the "clear span between supports" increases in size, the majority has, in effect, rewritten that regulation. Because such judicial revision of the regulation is unauthorized, and because nothing in the record indicates that it is "generally accepted" that by measuring the deflection for an arbitrarily selected portion of the wall, an individual can determine whether the total deflection for the entire wall is within that allowed by the regulation, see Frye, 293 F. at 1014, I would hold that the trial court erred in permitting Chesser to testify that deflections in the walls and certain other surfaces of the mobile home violated § 3280.305(d).[6]
Because Washington provided no other evidence that the walls, the roof, or the ceiling surfaces of the mobile home did not comply with federal regulations, I would hold that Chesser's testimony was not harmless error. See Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala. 1998) ("`[A] judgment cannot be reversed on appeal for an error unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.'" (Quoting Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992) (omission in original))). Accordingly, I would hold that the trial court erred in denying Southern Energy's motion for a new trial.
NOTES
[1] The theory for claiming on implied warranties against the manufacturer Southern as the "seller" was that the mobile home was specially ordered by Washington and was custom-manufactured for him by Southern.
[2] Washington's complaint states that Jack Lee committed fraudulent misrepresentation and fraudulent suppression by intentionally or recklessly telling him that the mobile home "would be free of defects."
[3] Southern argues that the presentation of the telephone bill irreparably damaged its credibility because it had stated in its opening statement that "Washington would not be able to prove through phone records that he, or anyone on his behalf, had telephoned Southern regarding his mobile home." Washington disputes this assertion, arguing that Southern had stated only that "there would be no evidence of any notice given to Southern ... in this case." Southern concedes that the record does not contain any portion of its opening remarks. Accordingly, this Court cannot address this dispute. See Birmingham So. R.R. v. McDonald, 339 So.2d 1004, 1006 (Ala.1976) (holding that this Court is prohibited from considering matters outside the record).
[4] Southern also argues that one of these witnesses was not qualified to testify that the type and quality of the soil where a mobile home is situated often determine whether settlement occurs in the home. Specifically, Southern objected when Washington asked the witness if the mobile home was on "a good lot or a bad lot." The record indicates, however, that the witness was a general contractor who built foundations for homes. We find no abuse of discretion in allowing this witness to testify that the mobile home was situated on a "good lot." See Baker, 537 So.2d at 3.
[5] We note that the federal courts have abandoned the Frye test. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). We note, however, that the Alabama Legislature has adopted the Daubert standard only with respect to the admission of deoxyribonucleic acid ("DNA") evidence. See § 36-18-30, Ala. Code 1975; Turner v. State, 746 So.2d 355 (Ala.1998). Neither Southern nor Washington argues that this Court should abandon Frye in favor of Daubert with respect to the admission of all other evidence. Because the parties have not raised this argument, we decline to address the issue at this time. See Jackson v. Reed, 438 So.2d 750, 753 (Ala. 1983) (stating that this Court should not act sua sponte in addressing and deciding an issue not framed by the pleadings unless a fundamental miscarriage of justice will otherwise ensue). For a discussion of the Frye criteria, see Ex parte Perry, 586 So.2d 242, 247 (Ala.1991).
[6] My dissent is not meant to suggest that Chesser should not have been permitted to testify that the deflections in the walls and certain other surfaces of the mobile home were otherwise deficient.